# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 05-3843

———————

United States of America,

        Appellee,

v.

Dennis Eugene Mentzos, II

        Appellant.

\*
\*
\*
\*
\*   Appeal from the United States
\*   District Court for the
\*   District of Minnesota.
\*
\*
\*

———————

Submitted: May 17, 2006
Filed: September 11, 2006

———————

Before LOKEN, Chief Judge, JOHN R. GIBSON, and COLLOTON, Circuit Judges.

———————

COLLOTON, Circuit Judge.

Following a jury trial, Dennis Eugene Mentzos was convicted of one count of sexual exploitation of a child in violation of 18 U.S.C. § 2251(a) and (d), one count of aiding and abetting the mailing of child pornography in violation of 18 U.S.C. § 2252(a)(1), (b)(1) and (b)(2), and one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4) and (b)(2). The district court[1] sentenced him to 480 months' imprisonment. Mentzos appeals, and we affirm.

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

I.

Mentzos was indicted on April 14, 2004, for charges arising from his communications with a 13-year-old girl, M.S., during which he eventually persuaded her to mail him naked photographs of herself. Mentzos had been civilly committed to the Minnesota Sex Offender Treatment Program as a "sexually dangerous person" since 1995, and he was housed at the state security hospital in Moose Lake, Minnesota. Assistant Federal Public Defender Scott Tilsen was appointed to represent him. On May 28, 2004, Mentzos filed a pro se motion for substitution of counsel, which the court denied because Mentzos had "not shown justifiable dissatisfaction with his appointed counsel." Despite the court's denial of the motion, the public defender's office substituted Chief Public Defender Daniel Scott in place of Tilsen as Mentzos's counsel. Scott then moved to have Mentzos evaluated, pursuant to 18 U.S.C. § 4241, to determine his competency to stand trial. The court granted the motion and transferred Mentzos for evaluation.

On October 27, 2004, Mentzos filed a second pro se motion for the appointment of new counsel, which the court denied at a hearing held on October 29. Scott then filed a motion to withdraw as counsel, noting that he was doing so at Mentzos's request, and the court denied this motion as well. On November 23, Mentzos filed another pro se motion to appoint new counsel. The court also denied this third motion, finding that Mentzos had not shown "justifiable dissatisfaction" with his appointed counsel. On January 12, 2005, Scott filed another motion to withdraw, requesting that a private attorney be appointed to represent Mentzos pursuant to the Criminal Justice Act, or, if Mentzos was found to be competent, that Mentzos be permitted to represent himself. The motion stated that "Mentzos has been unable to deal with his presently appointed counsel, first Mr. Scott Tilsen, and then Mr. Daniel Scott, of the Federal Public Defender's Office for most of the time that the attorney/client relationship has existed." (R. Doc. 55-1, at 1).

A competency hearing was held on January 19, 2005. The district court, adopting a report and recommendation of a magistrate judge,[2] found Mentzos competent to stand trial despite his lack of cooperation with certain psychological testing. The court found, based on the testimony of a forensic psychologist, that although Mentzos "is afflicted with a chronic antisocial disorder, and with a narcissistic disorder," (R. Doc. 57, at 16), his conduct "is volitional, tactical, and strategic, and not the product of psychosis, or severe mental disease." (*Id*. at 17). His lack of cooperation with his attorneys "is not because he is unable to cooperate, but because he is unwilling to and believes he deserves special treatment." (*Id.* at 19).

On February 28, 2005, the court granted Scott's motion to withdraw, finding that despite the "competent and professional" representation Mentzos had received from Tilsen and Scott, "the differences between the Defendant and Scott are intractable, and a reconciliation between them seems remote." (R. Doc. 65, at 9). The court noted, however, that the forensic psychologist "predicted that the Defendant would, in all probability, be uncooperative with any appointed attorney who did not proceed exactly as the Defendant wished." (*Id.*). Because the court did not "think it proper to impose upon the Defendant the burden of self-representation," it provided Mentzos "**one, final** opportunity to cooperate with a Court-appointed attorney," (*id.* at 10) (emphasis in original), and directed the appointment of a private attorney under the Criminal Justice Act.

Michael Davis was appointed to serve as Mentzos's attorney on March 3, 2005. [R. Doc. 66] On March 24, however, Mentzos filed another pro se motion for the appointment of new counsel or, alternatively, to represent himself if the court would not appoint a different attorney. In support of his motion, Mentzos claimed that Davis did not meet with him sufficiently in advance of a motions hearing, was appointed by

---

[2]The Honorable Raymond L. Erickson, United States Magistrate Judge for the District of Minnesota.

the Federal Public Defender's Office, and did not request the motions hearing to be scheduled in Minneapolis rather than Duluth.

Magistrate Judge Erickson held a hearing on March 30 regarding this motion. Mentzos complained that if the court "denies to appoint me as requested an attorney void of Dan Scott and the Federal Public Defender's Office, then the defendant contends its denial would result in governmental tactics that have amounted to coercion and an involuntary waiver to counsel." (Pretrial Mot. Hr'g Tr. at 7). The court explained that Davis was "not answerable" to Scott and his fees were considered by the court, not the Federal Public Defender. The court found Mentzos's request for substituted counsel to be "inappropriate and unsubstantial and it isn't justifying the appointment of other counsel." (*Id.* at 10-11). Mentzos responded that "I will not accept it and I will represent myself," to which the court replied "[i]f you want to represent yourself, you have a constitutional right to represent yourself." Mentzos stated "[t]hat's what I wish to do," and the court proceeded to conduct a hearing as required by *Faretta v. California*, 422 U.S. 806, 835 (1975).

The court inquired into Mentzos's educational and legal background and his understanding of the charges against him, as well as the potential penalties. The magistrate judge strongly counseled Mentzos against representing himself, stating:

> To represent yourself in the complexities of the Federal Criminal Code without the benefit of knowing the intricacies . . . of the Federal Rules of Evidence and the Federal Rules of Criminal Procedure, not to mention the United States Sentencing Guidelines, is not unlike performing surgery on yourself notwithstanding the fact that you have no medical training or knowledge. . . . I strongly urge you, I implore you not to represent yourself. Now, in light of the penalties that you might suffer if you are found guilty, in light of all the difficulties in representing yourself, do you still desire to represent yourself and to give up your right to be represented by a lawyer?

(Pretrial Mot. Hr'g Tr. at 27). Mentzos replied that he "one hundred for positive percent" and "[u]ndoubtedly" wanted to represent himself, and the magistrate asked him whether his decision was voluntary. Although Mentzos originally indicated he felt "forced or coerced to choose between [Davis] or me," when the court advised him he would not be permitted to represent himself unless he was choosing to do so voluntarily, Mentzos stated that "[t]o get rid of all these guys it's voluntary" and told the court that he was electing to proceed of his own free will. (*Id.* at 30). The court found that Mentzos knowingly and voluntarily waived his right to counsel and would be permitted to represent himself, but requested that Davis serve as standby counsel. Prior to trial, Davis attempted to visit Mentzos in jail to offer assistance, but Mentzos refused to see him, though Davis noted that Mentzos did call him occasionally to discuss "logistical type questions." (*Id.* at 12).

On June 22, 2005, Mentzos submitted CJA forms requesting funds to obtain a forensic handwriting examiner, a document expert, a computer expert, and a forensic fingerprint examiner. At a pretrial conference held on July 14, he complained about the denial of expert services and stated that he was "not competent" to stand trial or to represent himself. (Pretrial Conference Tr. at 7). The court provided him with the choice of representing himself or proceeding with representation by Davis, and Mentzos attempted to waive his right to be present at his trial. Although the court noted that he had previously been evaluated and found competent to stand trial, it granted requests by Mentzos and Davis to provide a second competency evaluation prior to trial.

Based on this evaluation, the court found Mentzos competent to stand trial and to represent himself. The court also refused to permit Mentzos both to represent himself and be absent from the proceedings, but offered to appoint Davis as counsel if Mentzos insisted on waiving his appearance. Although Mentzos complained that the court was forcing him to accept Davis's representation by requiring him to choose between self-representation and authorizing Davis to represent him, he ultimately

replied, "I'll represent myself. I'm going to have fun. Yeah, I [sic] represent myself." (*Id.* at 19). Mentzos represented himself for the first three days of his trial before invoking his right to counsel, at which point the court appointed Davis to represent him. The government called two final witnesses, and then the defense rested without presenting a case.

At trial, M.S., who resides in San Jose, California, testified that she was originally contacted in early 2001 by a person calling himself "Christian Mendoza" through a telephone "teen dating chat line" on which she had left a message identifying herself as a 16 year-old Filipino. Christian responded, claiming that he was a 17-year-old Mexican high school senior from Minnesota. The two exchanged telephone numbers, and began to speak on a daily basis. When M.S. called Christian, occasionally another person would answer the phone, and Christian told M.S. to ask for "Denny" when that happened. M.S. recorded the phone number and message "Ask for Denny" on a piece of paper.

Their conversations quickly progressed from "school and teenage stuff" to sexual matters. Christian began sending M.S. "clothes, letters, CDs, some sexual things, like toys and movies" through the mail, first to her house, and then, after her parents discovered the packages, to the homes of her friends. M.S. sent him a small photo of herself taken at a mall. Christian also sent M.S. a Polaroid camera, and instructed her to take photos of herself naked and mail them to him. M.S. did not want to take the pictures, so she told him that her parents had discovered the camera. In response, he sent her a letter dated March 24, 2001, stating:

> I thought you loved me. I thought you cared about me. I wanna still
> believe that this is the first and very last time that you'll ever lie to me
> again, but in order to believe it, I want to see you keep your word and get
> me my pictures. . . . I'll get the pictures by next week or it's over.

(T. Tr. II at 199-201).

After receiving this letter, M.S. took photos of herself naked, with "Christian" directing her body positions over the phone. At Christian's instruction, she mailed the photos to 9240 University Avenue, N.W., #311, in Coon Rapids, Minnesota. The government presented a lease indicating that Mentzos's mother, Glenda Sanders, was a resident of this address. One of the packages and several letters that M.S. had received from "Christian" bore this return address. The same street address was listed on a packing slip from a manufacturer of adult products, collected from M.S.'s home, which noted Dennis Mentzos as the purchaser. The slip listed several items that were consistent with some of the sexually explicit items M.S. had received from Christian Mendoza.

Ron Starkey, a police officer with the City of San Jose, testified that he traced the phone number M.S. had provided to a pay phone located in the Moose Lake Treatment Center. When Officer Starkey contacted the treatment center, he inquired whether there was a person named "Denny" in residence. The chief executive officer of the treatment center, Rick Harry, replied that there was a "Denny," referring to Dennis Mentzos, and stated that Mentzos had access to the phone and used it. Harry also told Officer Starkey that a photo of a juvenile "Asian or Filipino" female had been found in Mentzos's room. Naked images in electronic form of the same girl, later identified as M.S., had been discovered on a CD-ROM found in the room of another patient in the facility, Robert French. When questioned about the digital images, French stated that Mentzos had given him the CD. The CD contained 13 naked images of M.S. in different poses, each labeled with the word "Dennis," followed by a number.

Following the discovery of these photos, Mentzos was interviewed by Dale Heaton, the chief of police of Moose Lake Police Department. When asked whether he had conversed with a minor female named M.S. in California, he initially replied, "[m]aybe so, maybe no," before ultimately denying the conversations. (T. Tr. III at 101). Mentzos also denied knowing anything about the picture found in his room, or

about M.S.  During the interview, Chief Heaton referred at one point to M.S. as Hispanic, and as Mentzos left the interview room, he commented, "[s]he's Filipino, not Hispanic."  Chief Heaton asked him, "[w]ho is?," and Mentzos answered by providing M.S.'s name.  (*Id.* at 104).  Mentzos then declined to explain the basis for his knowledge.

At trial, M.S. testified that Mentzos's voice sounded like the voice of "Christian."  The government also presented a recording of a telephone call placed by Mentzos from jail, in which he referred to himself as "Denny Mendoza" and spoke in Spanish.  A handwriting expert, who compared the letters written by "Christian Mendoza" with an exemplar obtained from Mentzos's jail cell, concluded that Mentzos had written portions of the letters.  A fingerprint expert matched three latent fingerprints on one of the letters with Mentzos's fingerprints.  After deliberating for an hour and a half, the jury found Mentzos guilty on all three counts.

## II.

Mentzos contends that his waiver of the right to counsel was equivocal, "more bravado than a clear assertion of his desire to represent himself," (Appellant's Br. at 17), and thus not voluntary.  He argues that the error was not harmless because he presented no defense.[3]  An accused's constitutional right to the assistance of counsel includes the related right to waive counsel and to conduct his own defense.  *Faretta*, 422 U.S. at 835.  Before permitting a defendant to represent himself, however, the court must assure itself that the waiver of the right to appointed counsel is knowing

---

[3]Mentzos also filed a pro se brief raising allegations of ineffective assistance of counsel.  It is not our practice to consider pro se pleadings filed by the parties represented by counsel, *United States v. Clark*, 409 F.3d 1039, 1041 n.2 (8th Cir. 2005), and, in any event, claims of ineffective assistance are more appropriately raised in a habeas corpus proceeding pursuant to 28 U.S.C. § 2255.  *United States v. Smith*, 367 F.3d 748, 751 (8th Cir. 2004).

and voluntary. *United States v. Patterson*, 140 F.3d 767, 774 (8th Cir. 1998). Although a defendant need not have the skill and experience of a lawyer to invoke his right to self-representation, the court must make the defendant aware of the dangers and disadvantages of self-representation. *Faretta*, 422 U.S. at 835. The grant of Mentzos's motion to represent himself is reviewed *de novo*, and will be upheld "if the record shows either that the court adequately warned him or that, under all the circumstances, he knew and understood the dangers and disadvantages of self representation." *Patterson*, 140 F.3d at 774-75.

On this record, we conclude that Mentzos's decision to proceed pro se was knowing, intelligent, and voluntary. The court provided him with opportunities to be represented by counsel and encouraged him to use counsel on numerous occasions. Before allowing Mentzos to act as his own attorney at trial, the court twice evaluated his competency to represent himself and conducted a thorough *Faretta* hearing, during which it repeatedly warned Mentzos against representing himself, stressed the disadvantages of this choice, and advised Mentzos that the court thought it was a mistake not to accept the assistance of counsel. *See Faretta*, 422 U.S. at 835-36; (Pretrial Mot. Hr'g Tr. at 15-31; R. Doc. 85, at 17-21). Mentzos responded that despite the availability of a qualified attorney, he wanted to represent himself because "I know without a doubt that I am not being adequately represented and I without the risk of sounding grandiose I know darn well I can do a better job than what's being done in my case right now." (Pretrial Mot. Hr'g Tr. at 19-20).

Mentzos had several years of education beyond high school, was articulate, and had a sense of how to put on a defense. *See Patterson*, 140 F.3d at 775 (internal quotations omitted); *United States v. Day*, 998 F.2d 622, 626-27 (8th Cir. 1993). He participated in the court's voir dire of the jury, exercised his peremptory challenges, and raised objections during the trial, indicating that he was "able to grasp the nature of the charges against him and that he had the intellectual capacity required to understand the consequences of his decision." *Patterson*, 140 F.3d at 775. Mentzos

consulted with court appointed stand-by counsel during trial, thus demonstrating that he was aware of his right to counsel. *See id.* When Mentzos eventually requested assistance, he was immediately provided with counsel. Although he later may have regretted his choice, stating he had "made a mistake," (T. Tr. IV at 9), Mentzos unquestionably knew the dangers of self-representation and stubbornly chose to refuse appointed counsel.

Mentzos claims that despite the *Faretta* hearing, his choice was not voluntary because he felt "forced or coerced to choose between [Davis] or me." (Pretrial Mot. Hr'g Tr. at 30). While the "Hobson's choice" between proceeding to trial with an unprepared counsel or no counsel at all may violate the right to counsel, *see Gilbert v. Lockhart*, 930 F.2d 1356, 1360 (8th Cir. 1991), there is no constitutional difficulty where the defendant is provided the real alternative of choosing between adequate representation and self-representation. *United States v. Blum*, 65 F.3d 1436, 1442 (8th Cir. 1995). An accused does not have an absolute right to counsel of his own choosing, *Meyer v. Sargent*, 854 F.2d 1110, 1113-14 (8th Cir. 1988), and a district court "may properly require the defendant to choose either to proceed *pro se*, with or without the help of standby counsel, or to utilize the full assistance of counsel, who would present the defendant's defense." *United States v. Swinney*, 970 F.2d 494, 498 (8th Cir. 1992); *see also Blum*, 65 F.3d at 1442. The substitution of counsel is committed to the sound discretion of the trial court, *Meyer*, 854 F.2d at 1113-14, and the defendant bears the burden of showing justifiable dissatisfaction with appointed counsel to be granted a substitute. *Swinney*, 970 F.2d at 499.

There is nothing in the record before us to suggest that Davis's representation of Mentzos was substandard. The district court carefully considered Mentzos's claims of dissatisfaction and allowed him an opportunity to present his concerns about his attorney. After holding a hearing on March 30, 2005, the court thoroughly addressed each of Mentzos's complaints in a written order denying Mentzos's motion to appoint substitute counsel. (Pretrial Mot. Hr'g Tr.; R. Doc. 85). We agree with the district

court that there was no showing that attorney Davis was incompetent or inadequate, and we conclude that the court did not abuse its discretion by declining to provide a fourth appointed attorney to represent Mentzos. Mentzos's decision to represent himself was not rendered involuntary simply because the court required him to choose between qualified counsel and self-representation.

III.

Mentzos also argues the court erred in denying his requests for fingerprint and handwriting experts. He contends that the government did not present any "direct evidence" that he wrote the letters, but instead "relied upon the expertise of a fingerprint examiner, and a handwriting examiner to argue that the jury should draw that conclusion," so that the denial of independent experts resulted in an unfair trial. (Appellant's Br. at 28). The government contends that Mentzos failed to make any showing to the district court regarding his need for the experts, and fails to demonstrate on appeal that he was prejudiced by the denial.

Under 18 U.S.C. § 3006A(e), a district court is authorized to provide a defendant with expert services "necessary for adequate representation" if the court determines "after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them." The defendant bears the burden of demonstrating that these services are necessary to an adequate defense, *United States v. One Feather*, 702 F.2d 736, 738 (8th Cir. 1983), and must show a "reasonable probability that the requested expert would aid in his defense and that denial of funding would result in an unfair trial." *United States v. Thurmon*, 413 F.3d 752, 755-56 (8th Cir. 2005) (internal quotation and citation omitted). We have said that where the government's case "rests heavily on a theory most competently addressed by expert testimony, an indigent defendant must be afforded the opportunity to prepare and present his defense to such a theory with the assistance of his own expert." *United States v. Patterson*, 724 F.2d 1128, 1130 (8th Cir. 1984). The

-11-

decision to grant or deny funding for an expert witness under § 3006A(e) is committed to the sound discretion of the district court and will not be reversed absent a showing of prejudice. *Manning v. Nix*, 901 F.2d 671, 672 (8th Cir. 1990); *United States v. Bercier*, 848 F.2d 917, 919 (8th Cir. 1988).

In the present case, Mentzos was aware the government was attempting to obtain handwriting exemplars for comparison at trial even before he was indicted, and he was provided with the fingerprint analyst's report shortly after he was charged. The trial commenced over 15 months after Mentzos's indictment, yet he filed the application for expert funding fewer than four weeks prior to trial. When Mentzos stated at trial that he would not be able to cross-examine the government's expert because he had not been provided his own expert, the court explained that its denial of the request was based on the fact that it came "very late in the game and would have resulted in a continuance of the trial which I was unwilling to do at the late juncture the motion was brought." (T. Tr. III at 90).

We need not decide whether the untimeliness of Mentzos's request would be sufficient grounds to deny it, *compare United States v. De Jesus*, 211 F.3d 153, 156 (1st Cir. 2000), *with United States v. Colón Osorio*, 360 F.3d 48, 50 (1st Cir. 2004), for we conclude that Mentzos has failed to show prejudice arising from the absence of expert services. *See United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002). There is overwhelming evidence in the record that Mentzos communicated with M.S. over the phone and through the mail, and persuaded her to mail him the pictures. The letter sent to M.S. urging her to send the naked photos listed Mentzos's mother's residence as the return address. M.S. testified that she mailed both the small mall photo and the naked pictures to "Christian" at that same address, and the small mall photo was later found in Mentzos's cell. A packing slip recovered from M.S. listing various sexual items sent to her by Christian noted Mentzos as the purchaser, and the resident of the room in which officials discovered the CD containing the naked images labeled "Dennis" stated he had received the CD from Mentzos. Christian instructed

-12-

M.S. to call and "ask for Denny" at the number for a pay phone that Mentzos used in the treatment center. Mentzos's unprompted correction of the officer's mistake about M.S.'s nationality further indicates he was familiar with M.S. And at trial, M.S. testified that Mentzos sounded like "Christian." This is abundant evidence aside from the handwriting and fingerprint testimony to support the jury's finding of guilt beyond a reasonable doubt, and there is no reasonable probability that court-appointed handwriting and fingerprint experts would have changed the outcome.

VI.

Mentzos raises several arguments with respect to his sentence. We review the district court's application of the advisory sentencing guidelines *de novo* and its factual findings for clear error. *United States v. Mathijssen*, 406 F.3d 496, 498 (8th Cir. 2005). We review the ultimate sentence for "unreasonableness" with regard to 18 U.S.C. § 3553(a). *See United States v. Booker*, 543 U.S. 220, 261 (2005).

Mentzos first contests the court's application of adjustments for the use of a minor in commission of the offense under USSG § 3B1.4. The guidelines provide for a two-level adjustment "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension of, the offense." USSG § 3B1.4. An application note defines "used or attempted to use" to include "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." *Id.* § 3B1.4, comment. (n.1). While the defendant must affirmatively involve or incorporate the minor into the commission of the offense, the adjustment does not require active involvement on the part of the minor. *United States v. Paine*, 407 F.3d 958, 965 (8th Cir. 2005).

In addition to the evidence presented at trial, the government at sentencing produced evidence that in October of 2002, Mentzos mailed a letter written in Spanish to M.S. instructing her not to talk to the police. Mentzos argues that "[a]lthough the

-13-

record suggests that Mr. Mentzos sent packages to M.S.'s friends, and that after the charges were filed he sent one letter in which he suggested that M.S. not talk to the police," it is "not clear" that this conduct satisfies the requirements of § 3B1.4. (Appellant's Br. at 30). We disagree. Mentzos encouraged M.S. to take the pictures of herself in his letter dated March 24, 2001. He directed M.S. about how to position herself as she was taking the pictures, and he instructed her to mail the photographs to him. He also solicited the assistance of M.S.'s minor friends by mailing them packages to deliver to M.S., and then instructed M.S. to conceal the crime by refusing to speak to the police. Mentzos's conduct is sufficient to support the application of § 3B1.4.

Mentzos also argues that the court improperly departed upward from criminal history category V to category VI pursuant to USSG § 4A1.3. We review a court's decision to depart from the guideline range for abuse of discretion. *United States v. Porter*, 439 F.3d 845, 848 (8th Cir. 2006). The guidelines provide that a district court may increase a defendant's criminal history category where "reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." USSG § 4A1.3(a)(1). In making that determination, the court may consider "[p]rior similar adult criminal conduct not resulting in a criminal conviction," *id.* § 4A1.3(a)(2)(E), and "[p]rior similar misconduct established by a civil adjudication." *Id.* § 4A1.3(a)(2)(C). The court may weigh the similarity of past offenses to the instant offense, and the possibility that repeated offenses of a similar nature indicate a heightened need for deterrence. *United States v. Goings*, 200 F.3d 539, 542 (8th Cir. 2000). The court may also take into account "evidence of obvious behavior incorrigibility, including ongoing behavior patterns observed subsequent to the instant offense," *id.* (internal quotations omitted), and information establishing the "substantial likelihood a defendant will commit future crimes or his capacity for future violence." *Porter*, 439 F.3d at 849.

The court found an upward departure was warranted here because Mentzos's "record is severe and obviously does not bode well at all for the possibility of rehabilitation." (S. Tr. at 89). Mentzos has three prior convictions for criminal sexual conduct in the third degree. The opinion affirming his civil commitment as a sexually dangerous person found that he had committed sexual assaults against at least 13 minor females beginning in 1984, *In re: Mentzos*, No. C3-95-2331, 1996 WL 81721, at *4 (Minn. Ct. App. Feb. 27, 1996) (unpublished), but his criminal history score did not account for many of those assaults, because they did not result in criminal charges. (PSR ¶ 58). At the sentencing hearing, a counselor at the Minnesota Sex Offender Treatment Program testified that Mentzos continually circumvented facility rules to communicate with minor females by telephone and mail, and that he never meaningfully participated in sex offender treatment. [S. Tr. at 35-40.] The prior uncharged sexual assaults established in his civil commitment proceedings are similar to the instant offense and indicate a consistent behavior pattern not adequately reflected in his criminal history. *See Goings*, 200 F.3d at 542. Mentzos's determination to persist with sexual offenses against minors, even when detained in a secure facility for sexually dangerous persons, demonstrates the sort of "obvious behavior incorrigibility" that we have said may be grounds for an upward departure. *Id.* Under these circumstances, the district court did not abuse its discretion in concluding that the criminal history score seriously under-represented Mentzos's prior criminal conduct and the likelihood that he would recidivate.

Mentzos also argues that the adjustment for an aggravating role in the offense should not apply because the government did not offer evidence of any other criminally responsible participant. A two-level enhancement applies if the defendant was an organizer, leader, manager, or supervisor of at least one other participant. USSG § 3B1.1(c); *United States v. Mendoza*, 341 F.3d 687, 694 (8th Cir. 2003). To qualify as a "participant," a person must be "criminally responsible for the commission of the offense, but need not have been convicted." USSG § 3B1.1, comment. (n.1).

-15-

The district court concluded that the evidence supported the adjustment, because Mentzos was housed in a secure hospital, and "it's clear that packages were forwarded, things were sent and procured, apparently, by others and then mailed to the victim in this case, so I think clearly the enhancement for use of others applies." (S. Tr. at 88). The government argues that Mentzos used multiple people to facilitate his criminal conduct, including his mother, two of M.S.'s minor friends, and Robert French and Paul Lindberg, fellow residents of the treatment center. The government contends that Mentzos also arranged for his mother to send and receive packages for him, for French and Lindberg to help him view and store the nude images, and for the minors in California to receive packages for M.S. so that her parents could not intervene.

We have some doubt whether there was sufficient evidence to show that Mentzos's mother, French and Lindberg, or one of M.S.'s minor friends was a "participant" for purposes of § 3B1.1. There was evidence, to be sure, that these persons were used to facilitate Mentzos's criminal activity, but the use of third parties who are unwitting participants is not sufficient to establish an aggravating role in the offense. The government seems to gloss over the requirement that a participant be "criminally responsible" when it argues that French and Lindberg were "used, either *knowingly or unknowingly*, by Mentzos to view and store the child pornography in this case." (Appellee's Br. at 41).

Nevertheless, we conclude that any error in applying the two-level adjustment for role in the offense was harmless. The district court made clear that even if the adjustment did not apply, it would have imposed the same sentence of 480 months' imprisonment:

> It would be my sentence of 40 years even if I had chosen not to apply the enhancements which were the subject matter of our discussion today, as if I found a lower range, it would be my intent to sentence you to 480 months as an upward departure under the guidelines, because I find that

-16-

you have no appreciation of your conduct, you are manipulative to a number of individuals, and I don't reasonably think that will ever stop in your lifetime.

(S. Tr. at 93-94). We conclude that the factors described by the court are sufficient to justify a two-level upward departure from the advisory range. Even if Mentzos's mother, M.S.'s friends, and the other civilly-committed patients were unwitting participants in Mentzos's criminal scheme, the evidence established that he manipulated these persons to assist in child pornography offenses. The district court recognized that this manipulation was necessary to avoid the security procedures at the state hospital. Mentzos's involvement of French and Lindberg was particularly troublesome, given their status as patients in a sex offender treatment program at a secure facility. Even if the patients' participation was unwitting, Mentzos's act of placing persons known to be sexually dangerous in possession of child pornography carried great potential for undermining treatment efforts and prompting recidivism by others. This is an atypical aggravating circumstance not adequately considered by the advisory guidelines. *See* USSG § 5K2.0(a)(1)(B). Thus, although Mentzos may not have "managed" or "supervised" these persons in criminal activity within the meaning of § 3B1.1, the nature of the activity was sufficient to justify an enhanced sentence.

Finally, Mentzos argues that his sentence is unreasonable, because the court "did not adequately explain why the mandatory minimum sentence of thirty years did not meet the concerns enumerated in 18 U.S.C. § 3553(a)." (Appellant's Br. at 32). The court found that the sentence complied with statutory objectives set forth in § 3553(a), and that "a sentence of 480 months, or 40 years, puts you at the only age range I can think of where I think the public will be safe from you reoffending." (S. Tr. at 93). For the reasons discussed, we conclude that the court properly adjusted the guideline range upward to account for Mentzos's offense conduct and criminal history. The resulting advisory guideline sentence is presumptively reasonable, and

-17-

we believe that the reasons articulated by the district court demonstrate its reasonableness.

The judgment of the district court is therefore affirmed.[4]

_____

_____

[4]We deny Mentzos's motion to file this opinion under seal, because the decisions of the court are a matter of public record, and the circumstances of Mentzos's case are not sufficient to distinguish it from numerous other criminal cases in which our opinions are routinely published.