# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-1845

_____

Wallace James Beaulieu; Lionel Tohannie Yazzie; Larry DeLaney, Sr.; Emery
Eugene Bush; John Louis Beaulieu, III; Michael J. Gimmestad

*Plaintiffs - Appellants*

v.

Cal R. Ludeman; Joan Fabian; Terry Carlson; Jack Erskine; Dean Mooney; Paula
Johnson; Denise Considine; Eric Hattenberg; Dennis Benson; Greg Carlson; Brian
Ninneman; Ann Linkert, in their official and personal capacities

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 15, 2012
Filed: August 29, 2012

_____

Before RILEY, Chief Judge, SMITH and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Wallace James Beaulieu ("Beaulieu"), Lionel Tohannie Yazzie, Larry DeLaney
Sr., Emergy Eugene Bush, John Louis Beaulieu III ("Beaulieu III"), and Michael J.
Gimmestad (collectively, "Patients") are patients civilly committed to the Minnesota

Sex Offender Program (MSOP). The Patients brought suit under 42 U.S.C. § 1983 against Minnesota Department of Human Services officials ("DHS officials")[1] and Minnesota Department of Corrections officials ("DOC officials"),[2] alleging that various MSOP policies and practices relating to the Patients' conditions of confinement are unconstitutional. The district court[3] granted summary judgment to DHS officials and DOC officials on all of the Patients' claims. On appeal, the Patients assert that the district court erred in finding that (1) the Patients will not be housed again at the Annex—two units on the grounds of the Minnesota Correctional Facility–Moose Lake (MCF-ML); (2) there was no triable issue of fact on their claims that (a) Beaulieu and Yazzie were transferred to the Annex in retaliation for filing a lawsuit and (b) Beaulieu was transferred to the Behavioral Therapy Unit (BTU) located at the MSOP's Moose Lake Facility in Moose Lake, Minnesota, in retaliation

---

[1]DHS operates the MSOP program. The DHS officials involved in this action include: (1) Dennis Benson, the MSOP Executive Director since March 2008; (2) Denise Considine, the Annex Director from March 2006 until May 2007; (3) Jack Erskine, the MSOP Director from summer 2006 to June 2008; (4) Greg Carlson, the MSOP Moose Lake Program Director from May 2008 to the present; (5) Eric Hattenberg, the Annex Unit E Director from March 2007 until April or May 2009; (6) Paula Johnson, the Annex Security Director and Program Manager from summer 2006 to November 2007; (7) Ann Linkert, the Annex Program Manager since November 2007 and the Complex 1 Program Manager since July 2009; (8) Cal Ludeman, the DHS Commissioner; (9) Dean Mooney, the MSOP Director from February 2004 to summer 2006 and the Moose Lake Site Director (including the Annex) from summer 2006 to summer 2008; and (10) Brian Ninneman, the Behavioral Therapy Unit Group Supervisor.

[2]The DOC officials involved in this action include: (1) Joan Fabian, the DOC Commissioner, and (2) Terry Carlson, the Warden of the Minnesota Correctional Facility at the Minnesota Correctional Facility–Moose Lake from June 2001 to December 2007.

[3]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

for filing the instant suit; (3) the MSOP's unclothed visual body searches are constitutionally reasonable; (4) the MSOP's use of restraints during transport to and from the facilities is reasonable; (5) the MSOP's seizure of the Patients' televisions did not constitute an unreasonable seizure; (6) no actual harm or injury resulted from the MSOP's mail policies; (7) the MSOP's telephone policy, as it applies to privileged communications, is rationally related to the legitimate penological interests of security and conserving limited staff resources; (8) the temporary double-bunking of inmates and use of communal showers did not violate the Patients' privacy rights; (9) the Patients' claims of unsanitary conditions either were not supported by admissible evidence or were of such a short duration that they did not result in a due process violation; and (10) Beaulieu failed to identify any property or liberty interest implicated by the officials' refusal to give him access to a computer for legal research. We affirm.

## I. *Background*
### A. *Facilities*

The MSOP houses its patients at several facilities, including facilities located in Moose Lake, Minnesota. The MCF-ML, which the DOC operates, is located near the Moose Lake Facility. In 2006, because the MSOP patient population increased, the DOC agreed to permit the DHS to temporarily take over two units on the MCF-ML site known as the Annex. A razor wire fence marked the exterior perimeter of the MCF-ML. The MSOP took over Units 8 and 10 of the MCF-ML, which were separated from the remainder of the facility by a separate razor wire fence. The Annex units were shaped like a "Y," shared an outdoor courtyard separate from the MCF-ML, and were connected by a corridor under the MSOP's control. Both DOC and DHS staff monitored the Annex entrance; however, the DOC staff did not interact with Annex patients or visitors.

In February 2006, MSOP and DOC staff met to address operational issues regarding the MSOP's temporary use of the facilities. During these meetings, Warden

Carlson shared the DOC's security policies with the MSOP staff to ensure the security of the DOC's facility. Aside from sharing DOC policies, the DOC did not use any other means to ensure that the MSOP used DOC procedures.

The MSOP sought the DOC's advice regarding the upgrading of the MSOP's security practices in light of recent security breaches at another MSOP facility in St. Peter, Minnesota. According to Mooney, a director for the MSOP and the Annex, a DOC official strongly recommended that the MSOP implement unclothed visual body searches upon patients leaving and entering the Annex. Mooney testified that he and Erskine, another MSOP director, had already determined that they were going to implement unclothed searches in light of the security risks that patients posed, population growth, and the need to strengthen security. Mooney testified that the MSOP made the decision to implement unclothed visual body searches of patients.

Erskine, who was Mooney's supervisor at the time, did not attend the meetings between the MSOP and the DOC as to the MSOP's use of the Annex. But his understanding, based on what Mooney told him, was that the only policy that the MSOP had to adopt regarding its use of the Annex was the unclothed-search policy. According to Erskine, the MSOP carefully made its decision to implement the DOC's requested unclothed-search policy. Erskine testified that DHS and therapy staff reviewed the policy because of a concern that the unclothed searches would disrupt the therapeutic environment. According to Erskine, the MSOP adopted the unclothed-search policy because it needed the space temporarily and because his staff reported to him that if the MSOP did not adopt the search policy, the DOC would not permit the MSOP to use the Annex. Aside from the unclothed-search policy, the MSOP developed its own security policies, and it did not implement any other DOC policies at the Annex. The MSOP would, however, refer to DOC policies in some cases.

-4-

From August 2006 to June 2009, the MSOP operated the Annex. In July 2009, the MSOP moved out of the Annex, and the DOC converted the Annex into living units for its inmates.

After the MSOP vacated the Annex, the MSOP continued to operate the Moose Lake Facility and opened Complex 1. The Moose Lake Facility has four conventional units, the BTU, and a special needs medical unit. In July 2009, Complex 1 opened with five units.

## B. *Patients' § 1983 Suit*

The Patients brought suit under 42 U.S.C. § 1983 against DHS and DOC officials, alleging that various MSOP policies and practices relating to the Patients' conditions of confinement at the Annex, the BTU, and Complex 1 are unconstitutional.[4]

The DOC officials moved for summary judgment as to all claims, arguing that they had no decisionmaking authority over the MSOP. The DHS officials also moved for summary judgment on all claims, asserting that there were no genuine issues of material fact and that they were entitled to judgment as a matter of law on the Patients' constitutional claims. The district court granted summary judgment in favor of the DHS and DOC officials.

## II. *Discussion*

On appeal, the Patients argue that the district court erred in granting summary judgment to the DHS and DOC officials because triable issues of fact exist as to their claims that the DHS's and DOC's policies and practices violate their constitutional

---

[4]At the time that the Patients commenced this suit, they were housed in the Annex. After the MSOP stopped using the Annex to house patients, Beaulieu was transferred to the BTU; Yazzie, DeLaney, Bush, and Gimmestad were transferred to Complex 1; and Beaulieu III was transferred to the facility in St. Peter, Minnesota.

rights. Specifically, the Patients claim that the DHS and DOC officials, through the challenged policies and procedures, violated their constitutional rights by (1) retaliating against them for filing other civil actions; (2) forcing them to endure invasive, full-body strip searches whenever they leave a facility's secure perimeter; (3) placing them in full restraints for transport, regardless of an individual's risk; (4) seizing their televisions without compensation; (5) opening their legal mail outside of their presence; (6) restricting their telephone access, including attorney calls; (7) not providing them with adequate privacy in showers and toilets; (8) subjecting them to unsanitary conditions; and (9) denying them access to legal computers. The Patients also assert that the district court erred in denying them injunctive relief pertaining to the Annex based on its finding that there was no indication that any MSOP patients will be housed at the Annex again.

"We review summary judgment de novo, viewing the record in the light most favorable to the non-moving party." *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004). A district court properly grants summary judgment when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id*.

## A. *Injunctive Relief*

The Patients argue that the district court erroneously determined that the Patients will not be housed at the Annex again. According to the Patients, because the MSOP population is growing at a faster rate than the MSOP's capacity, the MSOP will likely use the Annex again for additional space. They also maintain that the MSOP's voluntary cessation of the alleged illegal practice does not deprive the court of its ability to determine the legality of the practices.

"In general, a pending claim for injunctive relief becomes moot when the challenged conduct ceases and there is no reasonable expectation that the wrong will be repeated." *Roubideaux v. N.D. Dep't of Corr. & Rehab.*, 570 F.3d 966, 976 (8th

Cir. 2009) (quotation and citation omitted). A court properly dismisses a claim as moot "if it has lost its character as a present, live controversy of the kind that must exist if [the court is] to avoid advisory opinions on abstract questions of law." *Id*. (quotation and citation omitted). "We lack jurisdiction over cases in which, due to the passage of time or a change in circumstances, the issues presented will no longer be live or the parties will no longer have a legally cognizable interest in the outcome of the litigation." *Id*. (quotation, alteration, and citation omitted).

In the present case, "[a]ll of the [Patients] have been transferred out of [the Annex], and there is no suggestion that they might be returned." *Id*. The Patients merely speculate that MSOP's population is growing and, therefore, the Patients will return to the Annex. The Patients' "speculation and conjecture are insufficient to defeat summary judgment." *Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006). Therefore, we agree with the district court that the Patients' claim for injunctive relief pertaining to the Annex is moot. *See Robideaux*, 570 F.3d at 976 ("All of the Female Inmates have been transferred out of the NDSP, the James River CC, and the Missouri River CC, and there is no suggestion that they might be returned. Their class certification is for injunctive relief, and any equal protection claim arising out of their previous housing in those other facilities is now moot."); *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 835 (8th Cir. 2009) ("[B]ecause Howrey is no longer incarcerated at the ISP and subject to the allegedly offending policy, his claims are moot.").

## B. *Retaliation*

In their complaint, the Patients alleged that DHS officials Ludeman, Mooney, and Erskine, as well as other MSOP staff retaliated against Beaulieu and Yazzie for filing a § 1983 suit on December 7, 2006, by transferring them to the Annex. Additionally, they alleged that these officials retaliated against Beaulieu for filing the instant suit by transferring him to the BTU.

To establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that [he] engaged in a protected activity, (2) that the defendants responded with adverse action that would "chill a person of ordinary firmness" from continuing in the activity, and (3) that "the adverse action was motivated at least in part by the exercise of the protected activity."

*L.L. Nelson Enters., Inc. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 807–08 (8th Cir. 2012) (quoting *Revels*, 382 F.3d at 876). "In brief, the plaintiff must show the official took the adverse action because the plaintiff engaged in the protected speech." *Revels*, 382 F.3d at 876. Although "[t]he causal connection is generally a jury question, . . . it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." *Id*. (quotation and citation omitted).

In the prison context, we have observed that prison officials are prohibited from "punish[ing] an inmate because he exercises his constitutional right of access to the courts." *Sisneros v. Nix*, 95 F.3d 749, 751 (8th Cir. 1996). But, "[i]n raising a retaliatory transfer claim, the prisoner . . . face[s] a substantial burden in attempting to prove that the actual motivating factor for his transfer was the impermissible retaliation." *Goff v. Burton*, 7 F.3d 734, 737 (8th Cir. 1993) (quotations and citations omitted). In such a case, the prisoner bears the burden of "prov[ing] that but for an unconstitutional, retaliatory motive the transfer would have not occurred." *Id*. at 738. "This is a 'but for' test dealing with motive, not causation." *Sisneros*, 95 F.3d at 752.

### 1. *Beaulieu and Yazzie's Transfer to the Annex*

In August 2006, the MSOP began using the Annex to house patients. The Annex was a "non-participant unit," which meant that if patients were not participating in a conventional sex-offender treatment, the MSOP would transfer them to the Annex. Beaulieu and Yazzie contend that their transfers to the Annex resulted from retaliation for filing a suit based on denial of their religious liberties. The undisputed facts show otherwise. Beaulieu and Yazzie filed a § 1983 action claiming

-8-

denial of their religious freedom ("Religion Suit") on December 7, 2006. Summons was served on the DHS officials on January 17, 2007. Beaulieu was transferred to the Annex on January 2, 2007, and Yazzie was transferred to the Annex on January 11, 2007.

Based on our review of the record, we conclude that no genuine issue of material fact exists as to Beaulieu's and Yazzie's retaliation claims; therefore, the district court properly granted summary judgment to the DHS officials. Beaulieu and Yazzie satisfied the first element of their prima facie case because they engaged in a protected activity—filing the Religion Suit. *See Haynes v. Stephenson*, 588 F.3d 1152, 1155–56 (8th Cir. 2009) ("The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity."(quotation and citation omitted)). But they failed to show that filing the Religion Suit was the "but for" cause of their transfers.

Beaulieu and Yazzie received their seven-day notice of transfer to the Annex on December 26, 2006, and again on December 29, 2006. Although they filed the Religion Suit on December 7, 2006, the record reflects that the U.S. Marshals Service served the DHS officials with the Religion Suit on January 17, 2007—*after* Beaulieu's and Yazzie's transfers to the Annex on January 2, 2007, and January 11, 2007, respectively. Beaulieu and Yazzie speculate that the DHS officials could have learned of the Religion Suit prior to being served; however, they cite no record evidence to support their assertion that the DHS officials actually knew about the Religion Suit prior to the date of service.[5] *See Bloom*, 440 F.3d at 1028 (stating that "speculation and conjecture are insufficient to defeat summary judgment"). As a result, the DHS officials could not have retaliated against Beaulieu and Yazzie for

---

[5]Even if the DHS learned of the Religion Suit from the search of Beaulieu's room on January 3, 2007, prior to the date of service, the search and purported copying of Beaulieu's "legal papers" occurred *after* Beaulieu's transfer to the Annex on January 2, 2007, and therefore cannot provide a basis for retaliatory transfer.

filing the Religion Suit when they did not receive notice of the suit until January 17, 2007—after Beaulieu's and Yazzie's transfers to the Annex.

Furthermore,"[e]ven if retaliation was one factor in the decision to transfer [Beaulieu and Yazzie to the Annex], [they] ha[ve] not shown that [their] transfer[s] would not have occurred 'but for' the retaliation." *Webb v. Hedrick*, 409 F. App'x 33, 35 (8th Cir. 2010) (unpublished per curiam) (citing *Kind v. Frank*, 329 F.3d 979, 981 (8th Cir. 2003) (finding retaliation not a "but for" cause of transfer where record demonstrated that inmate was disciplined and transferred due to pattern of misbehavior); *Ponchik v. Bogan*, 929 F.2d 419, 420 (8th Cir. 1991) (rejecting retaliatory-transfer claim even where retaliation was clearly factor in transfer)). The record establishes that if patients were not participating in conventional sex-offender treatment, then the MSOP would transfer the patients to the Annex. Both Beaulieu and Yazzie admit that they were not participating in treatment at the time they were transferred. Although Beaulieu testified that, prior to his transfer to the Annex, he had signed paperwork so he could return to treatment, the only available class for re-entry into treatment was at the Annex, not the facility at St. Peter.

### 2. *Beaulieu's Transfer to the BTU*

Beaulieu also alleges that the DHS officials retaliated against him for filing the instant suit by transferring him to the BTU. Patients are typically placed in the BTU because of continued behavioral problems. This behavior includes assaults and criminal activity; antisocial behavior; aggressive behavior toward staff and patients; and disruptive behavior, including interfering with others' treatment and not complying with the rules. A patient's treatment team—not DHS officials—determines whether the patient's behavior warrants placement in the BTU.

Beaulieu was transferred to the BTU on March 3, 2007. The Patients filed the original complaint in the present case on March 14, 2007. According to Beaulieu, he initially mailed the complaint on February 28, 2007, but it was returned to him

because he needed to file separate affidavits from each named plaintiff to proceed *in forma pauperis*. Beaulieu maintains that the return envelope from the district court had been opened and staples had been removed from the documents. The summons was not issued until June 7, 2007.

Beaulieu argues that the DHS officials had notice of the instant case because they opened and inspected the complaint prior to his transfer to the BTU on March 3, 2007. According to Beaulieu, shortly after the opening of this legal mail, he was transferred to the BTU. Again, "[e]ven if retaliation was one factor in the decision to transfer [Beaulieu to the BTU], [Beaulieu] has not shown that his transfer would not have occurred 'but for' the retaliation." *Webb*, 409 F. App'x at 35. Beaulieu does not dispute that an inmate may be placed in the BTU by his treatment team due to aggressive and disruptive behavior. He also does not dispute that supplemental incident reports show that he exhibited behavioral problems on January 20, 2007; January 21, 2007; and at least nine times in February 2007. Beaulieu does not argue that such incidents fail to indicate aggressive or disruptive behavior. Therefore, Beaulieu has not shown that "but for" the filing of the present suit, he would not have been transferred to the BTU.

### C. *Unclothed Full Body Searches*
#### 1. *Search Policy*

At the Annex, the MSOP conducted unclothed visual body searches of patients before and after they left the Annex's secured perimeter, after contact visits, and based on reasonable suspicion.

The MSOP determined, based on its experience with persons in secured facilities, that unclothed searches of patients were an effective method of detecting escape paraphernalia, hidden weapons, handcuff keys, and other contraband. The MSOP concluded that pat-downs over clothing were not as effective as unclothed searches because staff could miss small items.

The MSOP applied its search policy uniformly across the patient population and did not require a less intrusive search prior to a strip search. The MSOP search procedure mandated that the search occur in a private room. Two same-sex staff members and the patient were present. The patient removed his clothing and gave it to one staff member to be searched, while the other staff member conducted a visual search of the patient's naked body from five feet away. The visual search included the patient lifting his genitals, showing his arm pits and the bottoms of his feet, spreading his fingers and buttocks, opening his mouth, and running his hands through his hair. After the visual search, the patient dressed. Staff members only touched a patient if he lost his balance to prevent him from falling.

If a patient refused to undergo the unclothed visual body search before a contact visit, then he was only allowed a non-contact visit. If a patient refused to undergo the search before transport, then the patient was not transported, except in cases of medical emergencies. If a patient refused to undergo the search on return to the facility, then he was placed in protective isolation for one-to-one observation until he complied with the search or until the staff determined that the patient was not a security risk.

Since July 2009 when the MSOP vacated the Annex, the MSOP policy requires unclothed visual body searches before and after transport, after contact visits upon suspicion and with the facility director's approval, or if reasonable suspicion exists to believe that a patient has committed a crime or possesses contraband. "Patients refusing to participate in an unclothed visual body search will be restrained and escorted . . . to a Protective Isolation (PI) Unit or designated room." Once the patient arrives "in the designated area, staff will again ask if the patient is willing to participate in an unclothed visual body search." "If the patient continues to refuse to participate in the search," then staff will conduct a pat-down. A patient refusing to participate in the search "will be placed in an unoccupied room" with a camera, "if available, and staff will maintain continual patient observation via the camera." "If

a room with a camera is not available, the patient will be kept under continual staff observation." "If the patient continues to refuse to participate in an unclothed visual body search, a staff[-]assisted unclothed visual body search may occur." When patients refuse to undergo an unclothed visual body search, "[s]taff[-]assisted unclothed visual body searches [do] not occur without prior permission from the Executor Director or designee." Furthermore, such "search will not occur unless there is reasonable suspicion of imminent substantial risk to the safety or health of the patient, or the security of the facility."

The Patients testified that they underwent unclothed visual body searches at the Annex. On appeal, they argue that the "MSOP has provided no reasonable explanation for why strip searches are undertaken *before* a patient leaves the secure perimeter—a policy more restrictive than the MN–DOC imposes." According to the Patients, the MSOP has less intrusive methods available to identify contraband, including "pat-downs, metal detectors, x-ray scanners, partial strip searches, and drug sniffing dogs." They assert that, drawing all reasonable inferences in their favor, a genuine issue of material fact exists as to the reasonableness of the policy.

The purpose of the unclothed-search policy at the Annex *before* a patient left the secure perimeter was "to protect the transport team that was moving the patient, and to protect the public if [the patient] w[as] going out into the public to insure that contraband was not being smuggled that would assist in an escape or that could threaten the public." Johnson, the Annex Security Director and Program Manager, testified that the MSOP "had problems in the past where patients have secreted upon themselves contraband that could have assisted in an escape during a transport." These "kinds of items" included "[w]ire, a fashioned key, something that could have been used as a cuff key that would have potentially opened the restraints[, and] . . . .[g]lass, piece[s] of glass." The MSOP had "patients who moved out of one secure perimeter from one of [its] facilities and into another and drugs were found." In fact,

-13-

Beaulieu testified that he had been criminally charged with attempting to introduce contraband—marijuana and cocaine—into the BTU facility.

"The Minnesota program for civil commitment of dangerous persons like [the Patients] to state custody and the accompanying curtailment of their liberty interests is constitutionally permissible." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006). "The nature of [the patients'] liberty interest in being free from isolation must therefore be understood in the context of that commitment and its accompanying restrictions." *Id*. Under this court's precedent, involuntarily civilly committed persons retain the Fourth Amendment right to be free from unreasonable searches that is analogous to the right retained by pretrial detainees. *Serna v. Goodno*, 567 F.3d 944, 948–49 (8th Cir. 2009). "Although an involuntarily committed patient of a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner." *Revels*, 382 F.3d at 874 (citing *Andrews v. Neer*, 253 F.3d 1052, 1061 (8th Cir. 2001) (holding that an excessive-force claim from an involuntarily committed state hospital patient should be evaluated under the standard as an excessive-force claim brought by a pretrial detainee)).

Thus, the Patients' claim "turns in part on the extent to which this [c]ourt has sufficient expertise and information in the record to mandate, under the Constitution, the specific restrictions and limitations sought by those who challenge the visual search procedures at issue." *Florence v. Bd. of Chosen Freeholders of the Cnty. of Burlington*, 132 S. Ct. 1510, 1513 (2012). "In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of [institutional] security." *Id*. at 1513–14. The Supreme "Court has confirmed the importance of deference to correctional officials and explained that a regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'" *Id*. at 1515 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

-14-

Furthermore, the Court has "recognized that deterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions." *Id*. at 1516 (citing *Hudson v. Palmer*, 468 U.S. 517 (1984)). "[C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Id*. at 1517 (citing *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)). "The task of determining whether a policy is reasonably related to legitimate security interests is 'peculiarly within the province and professional expertise of corrections officials.'" *Id*. (quoting *Bell*, 441 U.S. at 548). As a result, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." *Id*. (quotations and citations omitted).

In the present case, the DHS officials "rightly proffer institutional security as a justification for the visual body-cavity search[es] of [the patients]." *Serna*, 567 F.3d at 953. The purpose of the unclothed visual body search policy *before* a patient left the secure perimeter was "to protect the transport team that was moving the patient, and to protect the public if [the patient] w[as] going out into the public to insure that contraband was not being smuggled that would assist in an escape or that could threaten the public." The DHS officials "had specific evidence and heightened concerns regarding" patients smuggling contraband out of the MSOP facilities to aid in an escape attempt. *Serna*, 567 F.3d at 953 (citing, *inter alia*, *Franklin v. Lockhart*, 883 F.2d 654, 656 (8th Cir. 1989) (considering, in the context of a prison, the "history of contraband in the building" in finding justification for visual body-cavity searches sufficient)).

The Patients argue that less intrusive methods exist to identify contraband, such as pat-downs, metal detectors, x-ray scanners, partial strip searches, and drug-sniffing dogs. But "officials are [not] required in all cases to apply the least-intrusive methods or proceed through a series of progressively more invasive techniques en route to

conducting highly invasive searches." *Id*. at 955. "The Court in *Bell* refused to adopt a less-invasive-means test." *Id*. (citing *Bell*, 441 U.S. at 559 n.40 ("[T]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." (quotation omitted))). If this court were to strictly apply a "less intrusive means" test, then we would "effectively deprive institutional administrators of the deference noted in *Bell*" and *Florence*. *Id*. Nonetheless,

> our cases dictate that, while it is not necessary for officials to employ the least-invasive search techniques available, it is proper for courts to consider the availability of simple, safe, and less invasive techniques that officers elected not to pursue when assessing the reasonableness of performing body cavity searches en mass on a treatment center population.

*Id*.

Here, the DHS officials offered a reasonable explanation for why less invasive search techniques are ineffective. Hattenberg, Annex Unit E Director, testified that the MSOP did not utilize pat-down searches or less intrusive search methods because "the very popular way to sneak contraband into the facility is when the client would leave, and there are various places that cannot be searched just using a pat search." Similarly, Mooney, an MSOP director, testified that pat-down searches "or other unclothed or other clothed search[es]" were "less effective" because "you're checking clothing that's crushed in your hand or something [sic] you can miss a small object, and margin for error is not acceptable." Also, David Prescott, Clinical Director for the MSOP Moose Lake Facility, averred that, in developing the MSOP's search policy, the MSOP "considered lesser restrictive options. For example, [the] MSOP considered use of metal detection, but [it] recognized that not all contraband that could be hidden on a client's body will be metal." He also noted that "the B.O.S.S. chair, a body orifice scanning chair," "only scans for metal objects; thus, non-metal

contraband would not be detected." Therefore, the MSOP's unclothed-search procedure was "designed to uncover contraband that can go undetected by a patdown, metal detector, and other less invasive searches." *Florence*, 132 S. Ct. at 1520.

We conclude that, under the specific facts of this case, the MSOP's policy of performing unclothed body searches of patients before they leave the secure perimeter is not unreasonable.[6]

## 2. *Search of Yazzie*

The Patients also argue that they presented evidence that Yazzie was subjected to a forced strip search prior to transport wherein staff removed his clothing and forced him to lie naked on the ground. They maintain that this evidence creates a genuine issue of material fact as to the reasonableness of the policy.

Benson, the MSOP Executive Director at the time of the incident, testified that he vaguely recalled "an incident occurring around an unclothed visual body search." Benson testified that, as a result of the search, an investigation occurred and a staff member was disciplined. Benson could not recall the name of the staff member who was disciplined. Greg Carlson, the MSOP Moose Lake Program Director at the time of the search, testified that he had "brief recall" of Yazzie's forcible strip search. He did not authorize the strip search and could not recall who did. According to Carlson, nobody was disciplined, and he did not "recall the specifics" of any investigation. He was "[n]ot sure" whether staff violated MSOP policy in conducting the strip search without his authorization.

---

[6]Because we hold that the MSOP search policy is reasonable, we need not consider the DOC officials' argument regarding their lack of involvement in the implementation of that policy at the Annex.

"Supervisors . . . cannot be held vicariously liable under § 1983 for the actions of a subordinate." *L.L. Nelson Enters.*, 673 F.3d at 810. "To state a claim, the plaintiff must plead that the supervising official, through his own individual actions, has violated the Constitution." *Id.* "The general responsibility . . . for supervising the operation of a [facility] is not sufficient to establish personal liability." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). "[A] bare allegation that someone in supervisory authority has been deliberately indifferent, without any specification of that person's contact in fact with the plaintiff, [or] even an explicit charge of inadequate training or supervision of subordinates, is [not] sufficient to state a [§ 1983] claim." *Id*.

"As we have held, a supervising officer can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quotations and citations omitted). The Patients' amended complaint does not allege that any of the named defendants "failed to train" or "failed to supervise" the offending staff members. Even if the Patients had alleged such claims, "a failure to supervise claim may be maintained only if a defendant demonstrated deliberate indifference or tacit authorization of the offensive acts." *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998) (quotations and citation omitted). Such "claim is governed by the deliberate indifference standard." *Id*. The Patients have produced no evidence of deliberate indifference on the part of any of the named defendants or shown that they authorized the search. And Yazzie admitted that none of the defendants directly participated in the staff-assisted unclothed search.

Accordingly, we hold that the district court properly granted summary judgment as it relates to Yazzie's staff-assisted unclothed search.

D. *Restraints*

1. *Restraint Policy*

On July 12, 2006, the MSOP instituted a full-restraints policy for transporting patients, which provides that "[p]atients will be transported in full restraints. Exceptions will be determined on a case-by-case basis." "Case-by-case basis" means that modifications are made for medical emergencies or medical conditions. Full restraints are placed on patients anytime that they travel outside of the secure perimeter and include a black box, a wrist chain, and leg irons. The MSOP makes no individualized determination of risk in determining whether to apply the restraints to a particular patient because attempting to do so in the past resulted in an escape attempt.

The Patients contend that sufficient evidence exists to show that the MSOP's use of full restraints during transport is an unreasonable and exaggerated response to a perceived security concern. They assert that the DHS officials have not explained why all of the measures—a black box, a wrist chain, and leg irons—are collectively reasonable.

"[L]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) (quotation and citation omitted). "This interest survives criminal conviction and incarceration. Similarly, it must also survive involuntary commitment." *Id*. "Yet th[is] interest[] [is] not absolute." *Id*. at 319–20. "In operating an institution such as [the MSOP], there are occasions in which it is necessary for the State to restrain the movement of residents—for example, to protect them as well as others from violence." *Id*. at 320. "The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint . . . is such as to violate due process." *Id*. at 320.

"[W]hether [the Patients'] constitutional rights have been violated must be determined by balancing [their] liberty interests against the relevant state interests. If there is to be any uniformity in protecting these interests, this balancing cannot be left to the unguided discretion of a judge or jury." *Id*. at 321. "[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id*. The State "may not restrain residents except when and to the extent professional judgment deems this necessary to assure safety." *Id*. at 324. Therefore, residents "enjoy[] constitutionally protected interests in . . . reasonably nonrestrictive confinement conditions." *Id*. To determine if

> the State has met its obligations . . . , decisions made by the appropriate professional are entitled to a presumption of correctness. Such a presumption is necessary to enable institutions of this type—often, unfortunately, overcrowded and understaffed—to continue to function. A single professional may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day. The administrators, and particularly professional personnel, should not be required to make each decision in the shadow of an action for damages.

*Id*. at 324–25.

Ultimately, "whether one applies *Youngberg*'s professional judgment standard or *Bell*'s punitive versus non-punitive distinction, the outcome is the same." *Thielman v. Leean*, 140 F. Supp. 2d 982, 991 (W.D. Wis. 2001), *aff'd*, 282 F.3d 478 (7th Cir. 2002). Either approach results in the court "defer[ring] to the professional expertise of the institution's administrators when evaluating the relationship between the challenged condition and the government's interest." *Id*. (citing *Youngberg*, 457 U.S. at 322–23 ("there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making decisions"); *Bell*, 441 U.S. at 548, 561–62

-20-

(plaintiff must identify "substantial evidence in the record to indicate that the officials have exaggerated their response" to genuine security concerns in order to overcome "heavy burden" to show that restriction is excessive)).

Here, the Patients "may be correct that the institution could address its security interests with a more tailored policy, but that is not the test." *Id*. at 992. "[N]othing in *Youngberg* suggests that the choice made by the institution must have been the least restrictive alternative available." *Id*. Instead, "*Youngberg* admonishes judges to respect the choices made by professionals at state institutions. So long as that choice was made by a professional, it is presumptively valid even if it is not the best alternative." *Id*. The Patients "ha[ve] not adduced a single piece of evidence to show that the [MSOP's] transportation policy represents a substantial departure from accepted professional judgment, practice or standards." *Id*. (holding that a Wisconsin institution's blanket policy of placing patients committed involuntarily as sexually violent persons in full restraints during transportation to and from facility was justified by security concerns and did not violate patients' substantive due process right to freedom from bodily restraint where policy was supported by specific instances of aggression by these patients and these patients had been adjudicated dangerous and committed to indefinite term); *see also Semler v. Ludeman*, Civil No. 09–0732 ADM/SRN, 2010 WL 145275, at *27 (D. Minn. Jan. 8, 2010) ("Given the rationale for the use of restraints, deemed necessary for safety reasons in light of the growth of the MSOP program, and possibly in response to an escape attempt . . . , it cannot be said that Defendants' actions are arbitrary or shocking to the conscience."). The MSOP's articulated reasons for using full restraints are for the safety of the public and staff and to prevent escapes and attempted escapes, which have occurred at MSOP facilities. We conclude that such policy is a proper exercise of the DHS officials' professional judgment.[7]

---

[7]Because we hold that the MSOP restraint policy is not unreasonable, we need not consider the DOC officials' argument regarding their lack of involvement in the

## 2. *Application of Restraint Policy to DeLaney, Yazzie, and Bush*

According to the Patients, they have also presented evidence showing unreasonable applications of the restraint policy, including the use of full restraints on patients during medical emergencies.

According to Bush, he was "put in full restraints for a medical trip to the [d]octor when [he] injured [his] shoulder." Similarly, DeLaney stated that he has been placed in full restraints—handcuffs, shackle, a black box, and belly chain—every time that he has been transported, despite his carpal tunnel syndrome. The "box between the cuffs hurts [DeLaney's] wrists," and occasionally his "hands go numb, even after the restraints are removed." According to DeLaney, he "ha[s] complained to medical personnel about this but ha[s] never been given treatment." And, Yazzie testified that, in January 2007, he injured his wrists due to the tight handcuffs during transport from the St. Peter facility to the Annex.

In the amended complaint, the Patients only allege that "[t]he use of excessive force in applying these restraints during [Yazzie's] transport to the Annex caused physical injury to Mr. Yazzie"; they do not allege an excessive-force claim as to Bush and DeLaney.[8] But even if they did, such claims would fail. "The appropriate inquiry [for an excessive-force claim] is 'whether *the force used* to effect a particular seizure is 'reasonable.'"" *Chambers v. Pennycock*, 641 F.3d 898, 906 (8th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "A *de minimus use of force* is insufficient to support a claim, and it may well be that most plaintiffs showing only *de minimis* injury can show only a corresponding *de minimis* use of force. The degree of injury is certainly relevant insofar as it tends to show the amount and type of force

---

implementation of the policy.

[8]Nor did the Patients allege that officials were deliberately indifferent to "a serious medical need or a substantial risk to a[] [patient's] health or safety." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009).

used." *Id.* (internal citations omitted). However, the possibility exists for a plaintiff "to prove an excessive use of *force* that caused only a minor *injury*." *Id.* Despite this possibility, we conclude that, in the present case, any excessive-force claim necessarily fails because Bush, DeLaney, and Yazzie "did not allege, or present any medical records indicating [that they] suffered any long-term or permanent physical injury as a result of the handcuffs." *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1008 (8th Cir. 2003); *see also Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (holding that "nerve damage" from being handcuffed too tightly did not constitute actual injury without "medical records indicating . . . any long-term injury as a result of the handcuffs").

### E. *Seizure of 20-inch Televisions*

On July 12, 2006, Erskine sent a memo to all patients notifying them that the MSOP was reducing the size of permitted televisions to 13 inches. According to Mooney, the MSOP reduced the size of allowed televisions to 13 inches for

> [t]wo reasons. One [was that] . . . the stands that were built onto the racks and the beds were built for 13[-]inch TVs, and 13 inches was also the size [that the MSOP] could order that would have the clear plastic housing on the TVs so that they were much more difficult to hide contraband in inside the TVs.

When the MSOP moved into the Annex, the shelves came with the existing bunks. The MSOP and DOC had no discussions about the size of the televisions in the Annex.

On March 13, 2007, David Pingry, Site Director of the Moose Lake Main Building, sent a memo to staff and patients, which provided that, effective immediately, patients could "possess or order either of these types of televisions, a 13[-]inch translucent television or a 17[-]inch LCD television." On March 20, 2007, Pingry issued another memo to staff and patients giving patients "an additional 90

-23-

days from today March 20, 2007, or until [m]idnight of Tuesday[,] July 19, 2007[,] to have any television over 17 inches removed from the Moose Lake, Main Building facility."

On July 24, 2007, Erskine sent out another memo to patients and staff to remedy any "confusion on what patients at MSOP are allow[ed] for personal television sets." According to Erskine, patients were allowed "13[-]inch clear chassis televisions"or "[u]p to 19[-]inch flat screen LCD's." These televisions were the only ones permitted. Property staff gave patients "a five (5) day notice to provide a plan for sending [the nonconforming televisions] out." Patients then had "thirty (30) calendar days to have [the nonconforming televisions] sent out." If the 30 days expired without a patient sending the nonconforming television out, then the staff would destroy it. For a period of time, the MSOP paid to have patients' nonconforming televisions sent out. Gimmestad, Yazzie and Beaulieu III all possessed nonconforming televisions, which were either disposed of or sent out of the facility.

The Patients assert that the district court erred in concluding that the MSOP's seizure of the nonconforming televisions did not constitute an unreasonable intrusion on their rights to their televisions. According to the Patients, the "MSOP claimed that the policy change related to space restrictions or the size of the cell shelf, not concerns of institutional security." The Patients contend that the MSOP's stated reasons for the policy change "creates an issue of fact as to whether or not [the Patients'] rights were violated by the seizure of their property." The Patients maintain that the MSOP's asserted rationale for the policy change is not a legitimate justification for forcing the Patients "to pay to destroy or send out their own property, particularly where there is no record of safety problems caused by larger televisions."

A "television set [is a] personal 'effect[]' protected by the Fourth Amendment." *Pepper v. Village of Oak Park*, 430 F.3d 805, 809 (7th Cir. 2005). Because the

-24-

Patients' "property is of the type protected by the Fourth Amendment, we turn to whether [the Patients'] effects were seized." *Id*. "A seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id*. (quotations, alteration, and citations omitted). "The interference which [the Patients] incurred . . . amounts to a 'seizure' under the Fourth Amendment." *Id*.

"To determine the constitutionality of a seizure we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Baribeau v. City of Minneapolis.*, 596 F.3d 465, 483 (8th Cir. 2010) (per curiam) (quotation and citation omitted). "Balancing the nature of the intrusion against the need for institutional security," *id*, we conclude that the Patients' Fourth Amendment claim fails. The MSOP identified two reasons for its policy requiring 13-inch "clear" televisions or 17- to 19-inch LCD flat screen televisions: (1) the shelves in the patients' rooms could safely hold these televisions, and (2) a clear-chassis television or LCD television would reduce contraband concealment and was only available in these sizes. These justifications implicate both patient safety and the MSOP's interest in "maintain[ing] security and order at the institution and mak[ing] certain no [contraband]. . . reach[es] [the patients]." *Id*. (quotation and citation omitted) (fourth alteration in original).[9]

## F. *Legal Mail*

Since at least 2004, the MSOP has required that staff check any incoming mail that scans positive for metal before distributing it to the patients. The mail policy also

---

[9]Because we hold that the MSOP television policy does not violate the Fourth Amendment, we need not consider the DOC officials' argument regarding their lack of involvement in the implementation of the policy.

mandates that patients open any packages[10] in the staff's presence. The MSOP learned from monitoring patients' phone calls that patients were using the mail to receive contraband and inappropriate correspondence. On April 25, 2006, Mooney sent a memorandum to all patients stating that "[e]ffective immediately, all incoming and outgoing non-legal mail on a case-by-case basis, including packages, is subject to being opened and inspected by Special Investigations staff." The memo explained that the "process [was] necessary to control the introduction of contraband and prohibited correspondence from entering the treatment facilities."

On July 16, 2006, Erskine sent a memo to patients about "[u]pcoming [c]hanges," including that "[a]ll patient mail will be processed through a mail room and will be checked for contraband prior to distribution." According to Erskine, this procedure really was not a change from prior procedure. According to Erskine, the MSOP "strengthened it more, but it was a procedure [the MSOP] always used. All mail went through a mail room and was distributed to patients and checked for contraband." Erskine stated that all mail went to the mail room where it was sorted; thereafter, all pieces—except legal mail—would be opened and checked for contraband. Erskine explained that, "[i]f it was identified as legal mail, it could be opened but not read. Legal mail was privileged so [the MSOP] did not tamper with legal mail if [it] knew for sure that it was legal mail, and most patients had identified who their attorneys [were]."

Similarly, Linkert, the Annex Program Manager since November 2007 and the Complex 1 Program Manager since July 2009, testified that if legal mail set off the

_____

[10]In the 2004 revision concerning communication and patient mail, a "package" is defined as "any item of mail larger than a #10 business envelope or thick and heavy enough to require additional postage." MSOP Policy 302.020, effective June 2, 2009, defines a "package" as "a wrapped or boxed object, a parcel or bundle containing one or more objects, a container in which something is packed for storage or mailing to be delivered by an authorized carrier."

metal detector, then staff would open it "in front of the patient." And, Johnson testified that if any mail, including legal mail, tested positive for metal, then staff opened it at the Annex's secured perimeter. Furthermore, Considine, the Annex director, testified that the MSOP's policy was to open legal mail at the Annex perimeter if it "wanded" positive for metal.

Packages for patients at the Annex initially came through the DOC's perimeter gate. Pursuant to both DOC and MSOP policy, either MSOP or DOC personnel handled and searched the packages. Warden Carlson testified that she did not know about legal packages and that a "package [was] a package." She also stated that legal mail for DOC prisoners was opened in their presence.

In June 2009, the MSOP issued a new mail policy stating that staff would open and visually inspect all incoming mail—except privileged mail—for unallowable mail or items. "Mail" included letters and packages. "Privileged mail" included "legal mail." "Legal mail" included "correspondence to or from the court, court staff, verified attorneys and established groups of attorneys involved in representing patients in judicial proceedings." Staff was to open and inspect all incoming packages; staff then sent the packages to the property department for distribution.

Beaulieu identified three occasions when staff opened his legal mail outside of his presence: (1) an envelope from the United States Marshal's Office was opened while he was at the Annex; (2) correspondence from the United States District Court that contained papers, which had a staple removed, was opened; and (3) a letter from Frank Bibeau, Beaulieu's civil-commitment attorney, was opened while Beaulieu was in the BTU. According to Beaulieu, staff told him that the mail received at the Annex was opened pursuant to the DOC's policy requiring a letter containing metal to be opened at the Annex gate prior to coming into the secured perimeter.

Yazzie testified that legal mail that the "court administrator" sent to him regarding the Religion Suit was opened in the Annex outside of his presence; however, he did not know what pieces of mail had been opened. According to Yazzie, staff told him that his mail was opened because the DOC wanded it positive for metal.

Beaulieu III testified that when he opened his legal mail, he did so in front of staff. But he also stated that his legal mail, including at least one unidentified piece of mail from his civil-commitment attorney, was opened outside of his presence. He could not recall the number of occasions on which this occurred. The only explanation given to Beaulieu III was that the mail was opened due to DOC policies and because the packages contained metal.

Gimmestad testified that he could recall three pieces of legal mail that were opened outside of his presence: (1) one from his civil-commitment attorney, (2) one from the Attorney General's office, and (3) one from the Bureau of Criminal Apprehension. Gimmestad confirmed that the opening of that mail outside of his presence did not cause him to miss a legal deadline, result in the dismissal of a claim, or result in an adverse judgment on a motion. He additionally stated that he had opened legal mail in front of staff.

According to DeLaney, in 2006, a court sent back a complaint in a property case because two pages were missing. DeLaney testified that when he sent the complaint to the court, all of the pages were present and that the two pages were destroyed at Moose Lake. He could only recall that his complaint dealt with a property case; he could not recall the court to which he sent the complaint. DeLaney testified that he had legal mail opened outside of his presence in 80 separate instances, including (1) a letter from the Attorney General's office; (2) a letter from his civil-commitment attorney; (3) a letter from the ACLU; and (4) a letter from his cousin, a federal judge, who was giving DeLaney advice on a complaint that he intended to file. DeLaney stated that his cousin, the federal judge, informed him that

-28-

the complaint was missing pages. DeLaney asserted that the only explanation that he received about staff opening his legal mail was that it was an accident.

The Patients argue that the DHS officials in the present case "rifled through and copied [their] privileged mail," giving the officials "an unfair advantage in this litigation." Specifically, they argue that the DHS officials retaliated against Beaulieu by transferring him from the Annex to the BTU after they opened his legal mail. They assert that the opening of his legal mail put Beaulieu's "claims at risk of being mooted and ma[de] it more difficult to coordinate litigation with his co-plaintiffs." They argue that the DHS officials have "provided no institutional interest for opening legal mail." As a result, they conclude that a genuine issue of material fact exists as to whether the DHS officials violated their rights by opening their legal mail in their absence.

In the prison context, we have observed that "[p]rivileged prisoner mail, that is mail to or from an inmate's attorney and identified as such, may not be opened for inspections for contraband except in the presence of the prisoner." *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) (quotation and citation omitted). But "[w]e have never held or suggested that an isolated, inadvertent instance of opening incoming confidential legal mail will support a § 1983 damage action." *Id*. at 431. Instead, we have found that "an isolated incident, without any evidence of improper motive or resulting interference with the inmate's right to counsel or to access to the courts, does not give rise to a constitutional violation." *Id*. (quotation, alteration, and citations omitted).

> The act of opening incoming mail does not injure an inmate's right to access the courts. The policy that incoming confidential legal mail should be opened in inmates' presence instead serves the prophylactic purpose of assuring them that confidential attorney-client mail has not been improperly read in the guise of searching for contraband.

*Id*. Therefore, "'[t]o assert a successful claim for denial of meaningful access to the courts . . . an inmate must demonstrate that he suffered prejudice'" from the "inadvertent opening of legal mail." *Id*. (quoting *Berdella v. Delo*, 972 F.2d 204, 210 (8th Cir. 1992)).

Here, the MSOP's mail policy provides that all "legal mail," which includes "correspondence to or from the court, court staff, verified attorneys and established groups of attorneys involved in representing patients in judicial proceedings," be opened in the patients' presence. The Patients have provided no evidence that any inadvertent openings of their legal mail resulted in actual prejudice. "Absent an articulation of how the alleged wrongful conduct actually blocked [the Patients'] access to filing a complaint, or caused a filed complaint to be deficient, [the Patients'] alleged injuries are merely speculative." *Hartsfield v. Nichols*, 511 F.3d 826, 833 (8th Cir. 2008).[11]

## G. *Telephone Access*

The MSOP put in place a phone system policy that only permits outgoing calls. As a result, patients cannot receive any incoming calls, including incoming calls from their attorneys. Under the MSOP's telephone policy, patients may make telephone calls to persons outside of the MSOP, subject to the MSOP recording their conversations. Also, patients may make unrecorded and unmonitored telephone calls for the purpose of privileged communications.

Although the MSOP prohibits incoming calls, it provides the patients with access to a patient voicemail system, which permits individuals outside of the facility to leave messages, subject to the MSOP recording and monitoring the messages.

---

[11]Because we conclude that the Patients failed to make out a constitutional violation regarding the DHS's mail policy, we need not reach the DOC officials' argument regarding their lack of involvement in the Annex's mail policies.

Because there is no way to distinguish between calls from attorneys and other calls in the voicemail system, the MSOP monitors all voicemails. Callers leaving a message on the voicemail system receive notice that messages may be monitored. Routine telephone calls are limited to 15 minutes. Under the amended policy effective October 6, 2009, prior to the connection of a patient-initiated telephone call, an introductory message notifies the recipient that the call is coming from a MSOP patient and that the call will be monitored and recorded.

MSOP policy defines "privileged calls" as including "a patient telephone call to a verified attorney licensed to practice law." Patients must request permission to place a privileged telephone call using the MSOP Patient Request Form. Staff members then facilitate and verify privileged telephone calls. MSOP policy limits such calls to 30 minutes, unless prior authorization is granted for a longer telephone call. BTU patients can make requests to their primary therapists to place a legal call. The legal therapist may grant the requests after verifying that the call is a legal call. Staff members attempt to arrange a legal call as soon as possible, which is usually the same day as the request or early the next day, depending on the availability of staff and when the request was received.

The MSOP has no specific written policy as to how soon a patient must be permitted to return a legal call; instead, patients return calls in a reasonable amount of time. This allows staff to verify that the number is to a patient's attorney. The period is usually one to two days, but on occasion the call has been returned on the same day or up to five days after the incoming call. When assessing when a patient can make a legal call, staff members consider the urgency of the call, such as if there is a pending court deadline. According to the MSOP, delays result from the staff receiving requests while they are dealing with other duties; the availability of the attorneys; the number of other patient requests pending; or other circumstances, such as a lockdown or telephone issues.

The MSOP put in place the 30-minute call rule because patients share the phone, have a limited time available for phone use because of the other activities, and generally do not need more time.

The Patients argue that the district court erred in finding that the telephone policy is constitutional. They contend that the current policy is actually an exaggerated response to rehabilitation and security concerns with obvious alternatives. They argue that the general ban on incoming calls, the monitoring of outgoing calls, and the limits on the length of legal calls is unreasonable. They also assert that the staff does not consistently facilitate privileged calls in a timely fashion and that the policy does not require the staff to facilitate calls within a certain time; for example, Beaulieu's requests have been repeatedly delayed by five days or more, and one of DeLaney's requests for an attorney call was delayed for three weeks. The Patients maintain that the DHS officials have not identified a security interest that outweighs the need for timely, attorney-client communications.

"Any form of involuntary confinement, *whether incarceration or involuntary commitment*, may necessitate restrictions on the right to free speech." *Martyr v. Bachik*, 755 F. Supp. 325, 328 (D. Or. 1991) (emphasis added) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977)). In the prison context, we have concluded that "the extent of inmates' First Amendment right to communicate with the outside world is a fact-intensive universe." *Holloway v. Magness*, 666 F.3d 1076, 1079 (8th Cir. 2012). "A prisoner has no right to unlimited phone use." *Benzel v. Grammar*, 869 F.2d 1105, 1108 (8th Cir. 1989). This means that "[a]lthough prisoners have a constitutional right of meaningful access to the courts, prisoners do not have a right to any particular means of access, including unlimited telephone use." *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992).

"*[I]f* the government chooses to create a public forum for speech, whether a general or a limited public forum, it may not unreasonably restrict the public's use of

that forum." *Holloway*, 666 F.3d at 1079. However, this "principle does not include a mandate to *create* any particular type of public forum, *such as providing inmates with telephone service*." *Id*. (second emphasis added).

"Because the Constitution 'permits greater restriction of [First Amendment] rights in a prison than it would allow elsewhere,' restrictive prison regulations are normally reviewed under the four-factor *Turner* test to determine whether they are 'reasonably related to legitimate penological interests.'" *Id*. at 1080 (citing *Turner v. Safley*, 482 U.S. 78 (1987)). Here, both parties agree that the *Turner* test applies. We consider four criteria in applying this test:

> (1) whether there is a valid, rational connection between the regulation and legitimate governmental interests put forward to justify it; (2) whether alternative means of exercising their rights remain open to the prisoners; (3) whether accommodation of the asserted rights will trigger a "ripple effect" on fellow inmates and prison officials; and (4) whether a ready alternative to the regulation would fully accommodate the prisoners' rights at de minimis cost to the valid penological interest.

*Benzel*, 869 F.2d at 1108.

With regard to the second *Turner* factor, "the issue is . . . whether inmates have alternative means of exercising the constitutional right they seek to assert." *Holloway*, 666 F.3d at 1080 (quotation and citation omitted). "Alternatives to the type or amount of speech at issue need 'not be ideal . . . they need only be available.'" *Id*. (alteration in original) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003)). For example, in rejecting an inmate's claim that elevated phone charges that the inmate must pay resulting from the prison's contract with a private telephone service provider violated the inmate's First Amendment free speech rights, we noted that "the record makes clear that ADC inmates retain many alternative means of communicating with family members and friends in the outside world—personal visits and mail as well as use of

-33-

the . . . telephone service." *Id*. at 1080–81; *see also Benzel*, 869 F.2d at 1109 ("The policy at issue only limits inmates' right to communicate by telephone, not their mail or visiting privileges.").

Applying the *Turner* factors, we hold that the MSOP telephone policy does not violate the Patients' constitutional rights."First, monitoring [non-legal] telephone calls and prohibiting incoming calls[12] is reasonably related to [the] MSOP's security interests in detecting and preventing crimes and maintaining a safe environment." *Semler*, 2010 WL 145275, at *16. Mooney testified that the MSOP began monitoring patient phone calls after patients escaped from the St. Peter facility, and the MSOP "learned that much of the support for the escape was conducted over the phone." According to Mooney, the MSOP "had a lot of suspicious activity[13] on the part of the

_____

[12]As explained *supra*, although the MSOP prohibits incoming calls, patients have access to a voicemail system that permits individuals outside of the facility to leave messages, subject to the MSOP recording and monitoring those messages.

[13]Dennis Smith, an MSOP special investigator, averred that "[s]ince the telephone system has been operational, Program staff members have been able to detect counter-therapeutic and potentially illegal activities by patients." Smith stated that, "in December 2005, Program staff members discovered that a patient was making over 100 sexual calls to a female vulnerable adult." And "[i]n November 2005, a patient made telephone calls to a female who was planning to smuggle hacksaw blades into the facility. Program staff members were able to discover this plan by monitoring the patient's calls and were able to prevent the crime." On one occasion, staff members learned "that another patient made approximately 800 telephone calls in a three[-]month period for the purpose of attempting to smuggle drugs and contraband into the facility for use and sale to other patients. This patient also discussed escape plans." Similarly, "[m]onitoring of another phone call developed information on another patient attempting to get someone on the outside to smuggle narcotics to him." Staff members also discovered through the monitoring of a patient's phone calls that the "patient was grooming a seventeen-year-old girl and trying to convince her to send photographs of herself wearing sexy, revealing clothing." As a result of these discoveries, Smith concluded that "the new telephone

-34-

patients occurring on the phones, and they were taking advantage of the fact that the phones weren't monitored."

For example, DHS Office of Special Investigators (OSI) Director Ralph Schmidt averred that his office "discovered [Beaulieu's] alleged criminal activity through monitored telephone conversations between Beaulieu and a former staff member." "Beaulieu [had] formed an inappropriate relationship with a former Program security counselor . . . ." This resulted in the counselor resigning from her position. After the counselor's resignation, Beaulieu and the counselor "conversed by telephone 508 times" over approximately a three-month period. "Through monitoring these conversations, OSI staff members discovered that Beaulieu and [the former counselor] were planning a conspiracy to smuggle controlled substances into the Program." They planned to conceal the drugs in a pair of sandals in a package addressed to Beaulieu. When the package arrived, OSI staff members "searched the package and found seven small clear glassine zip lock baggies containing cocaine and marijuana inside the hollowed-out soles of a pair of sandals just as Beaulieu and [the counselor] had conspired in their telephone conversations." Beaulieu was arrested and charged with "bringing contraband into a state hospital facility."

As for the MSOP's "rationale for limiting the length of legal calls," Mooney justified the call duration limit based on the fact that

> [t]he phone had to be shared [with other patients], and there's limited time with other evolutions that patients had within the facility; meals, recreation, work assignments, clinical groups, and the normal activities of the day[;] and it was generally understood and accepted that 30

_____

system has helped Program staff members detect and deter criminal activities by patients." Moreover, he said that the MSOP "is able to use its resources more effectively in preventing and protecting other patients and the public from criminal and counter-therapeutic behaviors."

minutes was usually more than sufficient time to consult with their legal advisors, and if more time was needed, the attorneys could always contact staff and ask for more time.

We conclude, like the district court, that "[i]n light of limited staff resources, this interest is reasonabl[y] related to a legitimate governmental interest of providing phone access to all patients."[14]

Second, the Patients "have viable alternatives by which they may exercise their First Amendment rights. They are not prevented from having visitors or sending or receiving permitted mail and they may use the telephone pursuant to [the] MSOP's policy." *Semler*, 2010 WL 145275, at *16. Smith averred that "[p]atients are able to send and receive mail as an alternate form of communication, if they choose not to use the telephone to communicate with their attorneys or any other persons." He also stated that "[p]atients are allowed to have visitors, with some restrictions that include specific visiting hours, length of visit[,] and limited physical contact." These restrictions "are necessary to maintain security in the facility and allow for more effective administration of the Program."

Third, permitting unrestricted telephone access would greatly impact the MSOP's resources. As the DHS officials point out, "[w]ithout monitoring, patients would be able to perpetrate crimes, obtain contraband, or engage in counter-therapeutic behaviors for longer periods of time without detection, if at all." And, as the district court noted, "allowing unmonitored calls or unlimited time on the phone affects both the security of other patients and staff, as well as the opportunities for all patients to make calls due to the monopolization of the telephone by a few patients."

_____

[14]The Patients have not challenged the length limitations for *non-legal* calls.

Fourth, no reasonable alternatives exist in light of the evidence presented. The DHS officials' testimony establishes that the patients abused telephone privileges prior to the implementation of the present policy by engaging in criminal activity or other counter-therapeutic behavior via the phones.

As to the Patients' claim that the phone policy unlawfully interferes with their right to communicate with counsel, we conclude that such claim is without merit. Pursuant to MSOP policy, patients may request additional time for legal calls that exceeds the 30-minute time limit. Moreover, as explained *supra*, patients have alternatives through which they may contact their counsel—mail and visits. "[L]imited access to telephone calls . . . is not a constitutional violation so long as [the patients] can communicate with their counsel in writing or in person by visits." *Ingalls v. Florio*, 968 F. Supp. 193, 204 (D.N.J. 1997) (citing, *inter alia*, *Aswegan*, 981 F.2d at 313).

## H. *Double-bunking, Showers, and Toilets*
Several of the Patients in the present case had roommates while housed at the Annex. The Annex rooms had no toilets. The MSOP imposed a curfew for Annex patients from approximately 9:40 p.m. to 6:15 a.m. However, there were no locks on the rooms.

According to Considine, the reason for double-occupancy at the Annex was that the MSOP "had more patients than rooms." The patient "population [at the Annex] grew, and [the MSOP] had to find a way to get the population to fit in the space [it] had." Considine stated that the MSOP "tried [its] best to put people together that were compatible. [It] tried to look at [the patients'] request[s] for who they wanted to be roommates with and allow them to be roommates with who they wanted." Although satisfying these requests was not always possible, the MSOP "did [its] best to make it happen so that people would get along and [the MSOP] wouldn't have the issues."

The Annex had communal bathrooms and toilets in enclosed stalls into which no one could see. Staff would make periodic checks of the bathrooms. If a staff member noticed that a patient had been in the bathroom for a long period of time, then the staff member would check the bathroom, announcing his or her presence before entering.

Beaulieu filed a grievance regarding an incident in which a staff member approached him while he was in the bathroom stall and teased him for taking so long with his bowel movement. But Beaulieu testified that no staff member has ever looked in on him while he was in the bathroom stall.

The Annex contained a communal shower room with a number of stalls that were four-by-four feet with curtains in front that were not transparent. The shower room had a door with a window, which was covered by a curtain on the outside of the door.

In Complex 1, all cells were designed to be used as double-occupancy rooms. The rooms are 80 to 85 square feet. The patients are locked in their rooms at night from 9:45 p.m. to 6:15 a.m. All rooms have toilets, which initially were not enclosed. During the second week of September 2009, patients received privacy screens that they could place around the toilets. In addition to the toilets in the patients' rooms, each living unit in Complex 1 has a bathroom with a toilet, sink, and a door that shuts.

The shower stalls in Complex 1 initially had doors that covered the torso area. DeLaney testified that "if anybody was on the second floor looking down, they could look right into the showers, and vice versa; if you're in the upper showers and somebody looks up, they could look right in on you." Similarly, Bush testified that "[i]f somebody was walking down at the bottom, they could see that you were in the shower." According to Bush, other patients "could almost see halfway up. If they are standing down below, they could see up, or if you're down on the bottom, they

. . . probably couldn't see that much." Bush stated that an individual "would have to go to the bottom of the door and look up" in order "[t]o see any of [a patient's] genital areas." The MSOP replaced these shorter shower doors with longer doors.

a. *Double Bunking*

The Patients assert that the MSOP's double-bunking requirement at the Annex in rooms not intended for two persons, and the continued double bunking of patients in Complex 1, violates their due process right to privacy. According to the Patients, they "are locked in these small rooms for eight to nine hours a day causing regular invasions of personal privacy."

The Patients "challeng[e] [the] MSOP's practice of double[]bunking, a practice held constitutional by the Supreme Court in *Bell* [, 441 U.S. at 538–41,] and *Rhodes* [*v. Chapman*, 452 U.S. 337 (1981),] and by [this court] in *Cody* [*v. Hillard*, 830 F.2d 912, 916 (8th Cir. 1987)]." *Aune v. Ludeman*, Civil No. 09–0015 (JNE/SRN), 2010 WL 145276, at *6 (D. Minn. Jan. 8, 2010).

> Those decisions hold that requiring two inmates or detainees to share a room does not constitute cruel and unusual punishment. While *Rhodes* and *Cody* reached that conclusion under the Eighth Amendment, the Court in *Bell* also held that there was no due process violation in confining inmates in a room originally meant for single occupancy.

*Id.*

The Patients have presented "no evidence that the double-bunking practice utilized by the MSOP is punitive." *Id*. Instead, the MSOP had a legitimate reason for double bunking at the Annex—the patient population had grown so large that there was insufficient room to allow for single occupancy. And, the rooms in Complex 1 were *designed* for double occupancy. Furthermore, the MSOP attempted to honor the patients' roommate requests and put compatible people together. *See id*. ("Moreover,

-39-

as in *Cody*, the administration at [the] MSOP has taken steps to reduce the negative impact of double[]bunking by taking care in the assignment of roommates."). Greg Carlson testified that the MSOP's placement committee conducted "a very thorough review of each placement." Carlson also explained that the MSOP conducted "wellness checks" "every hour" "to avoid inappropriate behavior" in the rooms. He also confirmed that the MSOP may conduct "an assessment. . . to determine whether or not double bunking might be counter[-]therapeutic for particular patients" and that there are "times when a decision has been made to not double bunk a particular patient."

### b. *Showers and Toilets*

The Patients also assert that the showers in Complex 1 did not adequately protect their privacy because other patients on different floors could look into the showers. They maintain that the remedial measures that the MSOP took failed to remedy the past deprivations of their privacy. Also, they argue that "Beaulieu was subjected to a particularly offensive invasion of his privacy" when a staff member "approached him while he was using the bathroom and mocked him for taking so long for his bowel movement."

Here, the Patients' privacy claim fails. "Because the need to watch [involuntarily-committed patients] closely is a legitimate institutional concern, a [patient] is entitled to little if any privacy, even when using the bathroom or taking a shower." *Sanders v. Kingston*, 53 F. App'x 781, 784 (7th Cir. 2002) (unpublished per curiam); *see also Spencer v. Bender*, Civil Action No. 08-11528-RGS, 2010 WL 1740957, at *3 (D. Mass. Apr. 28, 2010) (unpublished) (dismissing a privacy claim because "[a]n inmate's lack of privacy while using the toilet or shower also does not violate the Eighth or Fourth amendments"). Furthermore, even when the shower stalls in Complex 1 had doors that only covered the torso area, no evidence exists that other patients or staff could see showering patients' genitals or buttocks. In fact, Bush stated that an individual "would have to go to the bottom of the door and look up" in

-40-

order "[t]o see any of [a patient's] genital areas." And, the MSOP has since replaced the shorter doors with longer doors that prevent people from seeing a person in the shower.

Like the district court, we "also find[] no cognizable privacy claim on behalf of Beaulieu because a staff member teased him about taking too long in the bathroom." Beaulieu testified that no staff member has ever looked in on him while he was in the bathroom stall. And, MSOP policy required staff members to check the bathroom when they noticed that a patient had been in the bathroom for a substantial period of time; staff also had to make periodic checks of the bathroom, but they announced their presence before entering.

## I. *Sanitation Claims*

The Annex living units had more than one shared communal bathroom. Initially, the Annex had one daily, regularly-scheduled bathroom and shower cleaning. Within a few weeks of the Annex's opening, the Annex had two daily regularly-scheduled bathroom and shower cleanings, and the MSOP offered patients overtime to clean in between the regular cleanings. Hattenberg testified that the patients would clean the bathrooms, including mopping the floor and sanitizing all surfaces. As part of a work-for-pay job, patients were responsible for cleaning the communal bathrooms. But some patients responsible for cleaning the bathrooms failed to do so. In any event, the MSOP made cleaning supplies available to patients to the extent that they wanted to clean any part of the bathrooms. If the mess was "horrendous," the MSOP would offer the clean-up job to patients for overtime pay.

Patients at the Annex sometimes intentionally urinated or defecated on the floor. The MSOP's response was to have (1) the patient who made the mess clean it up, (2) work-for-pay patients clean it up with staff supervision, or (3) the general staff clean it up, if paid patients were unavailable. The affected area was off limits to

patients until the mess was cleaned. But patients could use another bathroom until the soiled one was cleaned.

Beaulieu testified that there were times that he reported a mess in the bathroom to the staff, and the staff cleaned the mess. But he also stated that at other times the staff waited until the paid patients' scheduled time to clean the bathroom, so that those patients could clean the mess. Beaulieu stated that he once saw a patient clean up urine in the bathroom with a mop and then use that same mop to clean the rest of the bathroom.

The MSOP does not train patients on how to clean, but it provides the patients with a sheet outlining their duties, including on how to deal with biohazards. Beaulieu knew that if a mop was used to clean a biohazard, then that mop should be placed in a biohazard bag for cleaning; then, the affected area should be sanitized with another chemical. Bush also stated that a mop used to clean a biohazard should be washed before reuse. DeLaney testified that all sorts of chemicals were used in the rags to clean the facilities. Yazzie stated that some patients simply rinsed used mops when new mops were not available; however, he never witnessed a patient doing so.

According to Bush, if someone soiled the showers, patients could not enter the bathroom until the mess was cleaned up. He testified that, in those instances, he would use the shower facilities in the west part of the facility. Additionally, he stated that sometimes the clean-up was slow; eventually, either another patient would clean the mess or staff would clean it.

There is no MSOP record of any patients becoming sick because of bodily wastes in the toilets or showers. Beaulieu stated that he contracted Norovirus while housed in the BTU, but there is no explanation of how the virus was spread.

According to Beaulieu, the MSOP made cleaning equipment available to patients to clean the dining tables, if they so desired. Bush testified that the tables were sanitized after every meal. And, Gimmestad testified that, as part of the kitchen crew, his job was to sanitize the tables before and after every meal. But, on January 19, 2009, Beaulieu sent a Patient Request Form asking staff to address the issue of feces being dropped in the dining area during mealtime and not being cleaned before the meal. MSOP's response was that "staff members picked up and washed areas when staff [are] available to do so."

The Patients assert that they presented adequate evidence showing the unsanitary conditions posed a substantial risk of harm and that the DHS officials knew of and disregarded their health and safety. They argue that the DHS officials' actions constitute deliberate indifference and that they have the right under the Fourteenth Amendment not to be exposed to unsanitary conditions. In support of their argument, they cite testimony that "the showers and bathroom floors in the Annex were frequently soiled with feces and bodily fluids." They contend that a genuine issue of material fact exists as to how fast these health hazards were addressed. According to the Patients, in contrast to Mooney's testimony that the messes "would be cleaned up and immediately attended to," staff would leave the unsanitary condition until the next scheduled clean-up. They argue that the DHS officials "were aware of the problem[,] and it is obvious that exposing residents to feces, semen, and blood creates a medical hazard."

"[I]nmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time." *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989). Under the Fourteenth Amendment, civilly-committed persons, like "pretrial detainees[,] are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment." *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005) (quotations and citations omitted). As a result, "we apply the identical deliberate-indifference standard as that applied

-43-

to conditions-of-confinement claims made by convicts." *Id.* "In order to establish a constitutional violation, [the plaintiffs] must show: (1) that [the conditions of their confinement] posed a substantial risk of serious harm (objective component), and (2) the [DHS defendants] actually knew of but disregarded, or were deliberately indifferent to, [the plaintiffs'] health or safety (subjective component)." *Id*. at 602.

"Conditions, such as a filthy cell, may be tolerable for a few days and intolerably cruel for weeks or months." *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 958 (8th Cir. 1994) (quotations and citations omitted); *see also Smith v. Copeland*, 87 F.3d 265, 268–69 (8th Cir. 1996) (holding that, where plaintiff was subjected to an "overflowed toilet in his cell for four days," such "allegations regarding 'raw sewage' d[id] not rise to a level of constitutional significance" because plaintiff "did not allege that he was exposed to disease or suffered any other consequences of the exposure" and was "offered an opportunity to flush the toilet and to clean up the mess but he declined"); *White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) (holding no Eighth Amendment violation where prisoner was confined to unsanitary cell for 11 days and noting that cleaning supplies were available to the prisoner).

Although "reasonably adequate sanitation" is a civilly-committed patient's "basic identifiable human need[]," *Whitnack*, 16 F.3d at 958, we find no evidence in the record that the DHS officials were deliberately indifferent to the Patients' health or safety. The Patients have produced no evidence as to the *length of time* that they were exposed to the unsanitary conditions in the bathroom and dining room. There is no dispute that the MSOP had the bathrooms cleaned at least daily. This daily cleaning indicates that the patients' exposure to the unsanitary conditions would not have exceeded 24 hours, too short a time to constitute a due process violation. *See Smith*, 87 F.3d at 269 ("[T]he length of time a prisoner is subjected to harsh conditions is a critical factor in our analysis."). Additionally, the record demonstrates that the MSOP made cleaning supplies available to the patients to clean up any soiled areas. *See White*, 7 F.3d at 121 ("If White had complained about the conditions of the

cell, he would have been provided with cleaning material in order to correct the alleged unsanitary conditions.").[15]

J. *Access to Legal Computers*

The MSOP provided patients with access to computers for legal research or to create legal documents. Mooney testified that patients had access to these "legal computers," provided that the patients signed up to use them and that "fair sharing" occurred among the patients. According to Greg Carlson, to access a legal computer, a patient must "sign up on a sheet reserving a specific period of time, and then they have access to it." If a patient "signed up that day [to use the computer, then that patient] could use it that day or the next day."

In Complex 1 and the main building of the Moose Lake Facility, patients have access to a legal computer lab, which they may sign up to use. The legal computer lab is located in the main building. The Annex had its own legal computer labs, one in Building 8 and one in Building 10, which patients could sign up to use. A patient's administrative-restriction status did not limit access to the legal computers unless "they were out of behavioral control." If a patient was out of behavioral control, that patient "would have to demonstrate controlled behavior" before the MSOP would permit that patient to use the legal computer lab.

In the BTU, staff sets up a legal computer in the team room each night from 6:00 p.m. to 8:00 p.m for patients to use in half-hour increments. More time is available upon request. According to Ninneman, BTU Group Supervisor, when a patient puts in a request to use the legal computer, he attempts to "answer requests . . . in a timely manner"—usually five working days after the initial request.

_____

[15]On appeal, the Patients have not challenged the district court's determination that they waived their sanitation claim against the DOC officials by failing to respond to the DOC officials' argument that the DOC was not involved with the cleaning procedures or protocols implemented at the Annex.

The Patients assert that "Beaulieu was repeatedly deprived of access to the legal computer without due process," as "[h]is requests were simply denied." He contends that the denials of his requests to access the computer "created hardship because he was representing himself in several legal matters and needed access to the computer." He argues that the district court erroneously found "that Beaulieu has failed to cite a protectable liberty interest where the evidence shows that Beaulieu's constitutional right to access to the courts was affected by the hardship."

> In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), [the Supreme Court] held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."

*Lewis v. Casey*, 518 U.S. 343, 346 (1996) (quoting *Bounds*, 430 U.S. at 828). In *Lewis*, the Court held that "in order to establish a violation of *Bounds*, an inmate must show. . . 'actual injury.'" *Id*. at 348. The Court explained that

> [b]ecause *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. That would be the precise analog of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary. Insofar as the right vindicated by *Bounds* is concerned, "meaningful access to the courts is the touchstone," *id*., at 823, 97 S.Ct., at 1495 (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished

-46-

to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

*Id*. at 351. "In other words, the inmate must show that the alleged deprivations actually hindered his efforts to pursue a legal claim." *Semler*, 2010 WL 145275, at *13.

Here, although Beaulieu missed a court deadline, the court gave him an extension of time; therefore, he has not proven an "actual injury" resulting from his purported denial of access to the legal computers.

Moreover, we agree with the district court that "Beaulieu has not identified any property or liberty interest implicated by defendants' refusal to give him access to a legal computer." "A due process claim is cognizable only if there is a recognized liberty or property interest at stake." *Ragan v. Lynch*, 113 F.3d 875, 876 (8th Cir. 1997). "We need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest . . . ." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Because Beaulieu has not identified what liberty or property interest the DHS officials deprived him of, any procedural due process claim necessarily fails.

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

_____